2024 IL App (1st) 221232

SIXTH DIVISION
January 5, 2024

No. 1-22-1232

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| STEVEN TAYLOR, Independent Administrator on Behalf of the Estate of Vanessa Taylor, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18 L 03145 |
| THE CITY OF CHICAGO, | ) ) ) | The Honorable Israel A. Desierto, Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Presiding Justice Oden Johnson and Justice C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     On June 28, 2015, Chicago Police Department (CPD) officers responded to a 911 "domestic" call at Vanessa Taylor (Vanessa) and James Thomas's (Thomas) apartment. By all accounts, Thomas was in a mental health crisis. Police transported Thomas to the hospital where he was given an antipsychotic sedative, administered a mental health examination by a physician, and discharged several hours later. Police officers left the hospital well before Thomas was discharged. Some 25 hours after police first responded to the 911 call, Thomas killed Vanessa in their apartment.

¶ 2 Steven Taylor (Steven), Vanessa's son, acting as the administrator of Vanessa's estate (Estate), brought a wrongful death and survival action against the City of Chicago (City). A jury found that Vanessa's death was caused by CPD's breach of its duty to protect Vanessa under the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/101 *et seq.* (West 2014)) and awarded $3 million in damages in favor of the Estate. The trial court denied the City's motion for a judgment notwithstanding the verdict (JNOV) and for a new trial, and the City timely appealed. We affirm the judgment of the trial court.

¶ 3                                I. BACKGROUND

¶ 4 We begin with a summary of the evidence admitted at trial. We also summarize arguments and rulings on the evidentiary objections and motions *in limine* at issue on appeal.

¶ 5                              A. The Estate's Case

¶ 6 CPD officer Nicholas Paxson testified that on June 28, 2015, he and his partner, Officer Joseph Stanula, responded to a 911 call that was classified as a "domestic" and a "high priority 1A" call at 4311 W. Flournoy in Chicago, Illinois. The 911 caller had requested both police and an ambulance. At the scene, Officer Paxson spoke to Lawrence Walton, Vanessa's son (Lawrence). Lawrence stated that he and Vanessa went inside the apartment, where they found Thomas, Vanessa's live-in boyfriend, walking around with swords and knives. They were afraid for their safety, but Thomas would not let them leave. Thomas eventually let Lawrence and Vanessa leave the apartment, and they did so out of fear for their own safety. Lawrence also told Officer Paxson that Thomas was starting grease fires. Officer Paxson smelled burning grease and saw haze in the stairwell leading to the apartment.

¶ 7 Officers Paxson and Stanula attempted to enter the apartment, but Thomas would not allow them in. Officer Paxson then asked Vanessa to help them coax Thomas out of the apartment.

2

Vanessa tried to talk Thomas into opening the apartment door, but he refused. Around that time, Officer Paxson learned from other officers who were observing Thomas through the back door that Thomas possessed a samurai sword and knife and appeared to be making Molotov cocktails. Officer Paxson had no doubt that Thomas was dangerous.

¶ 8 Once inside the apartment, Officer Paxson observed other police officers, who had entered the apartment another way, trying to arrest Thomas, but Thomas was resisting. The officers told Thomas to stop resisting. Police officers used a Taser on Thomas, but it did not immobilize him. Thomas then went into the kitchen and retrieved a sword and knife, at which point police officers tackled and handcuffed him. After realizing that Thomas had cut the gas line, police evacuated the apartment building.

¶ 9 Police officers escorted Thomas down the stairs, placed him in a squadrol, and transported him to Stroger Hospital of Cook County. He was transported in a squadrol instead of an ambulance because he was struggling with the officers. At some point during the transport, Thomas maneuvered his handcuffs from the back to the front of his body. Upon exiting the squadrol, Thomas lunged out, knocking down and injuring an officer. It took four officers to recuff Thomas's hands behind his back.

¶ 10 Once inside the hospital, four officers and medical staff worked together to strap Thomas's legs and arms to the bed. Officer Paxson remained at the hospital for approximately 25 minutes and then left. He did not speak to a doctor but spoke to other medical staff. He agreed that the hospital was brightly lit but denied seeing a bruise on Vanessa, who had accompanied officers to the hospital, or being told by either Vanessa or Lawrence that Thomas struck Vanessa a day or two before. Neither Vanessa nor Lawrence asked that Thomas be arrested, and neither asked for an order of protection.

¶ 11    Officer Paxson knew that he could complete paperwork to civilly commit an individual but stated that he informed medical staff that Vanessa would complete the paperwork. However, there is no such indication in the police report he prepared. He was under the impression that Thomas would be civilly committed even though the police report only indicated that Thomas would be mentally evaluated.

¶ 12    Officers Paxson and Stanula made the decision not to arrest Thomas because they were the "paper car" assigned to the call. Officer Paxson did not arrest Thomas for battery, aggravated battery, aggravated assault, obstruction or resisting a peace officer, disorderly conduct, or reckless conduct because he did not believe Thomas possessed the requisite *mens rea* for criminal liability due to his apparent mental health crisis. Officer Paxson admitted that Thomas's behavior was reckless. Officer Paxson also conceded that he was allowed to arrest people with mental illnesses and agreed that it would have been unsafe for Vanessa to return to the apartment with Thomas that night.

¶ 13    Officer Paxson was scheduled to end his shift at 11 p.m. on June 28. He finished writing his report of the incident at the police station at 1:29 a.m. on June 29. He was not scheduled to work on June 29 or 30.

¶ 14    Officer Stephanie Fox testified that, on June 28, 2015, she responded to a "domestic" 911 call. Upon arriving at 4311 W. Flournoy, she learned that Thomas was pouring burning oil in bottles and had a samurai sword. Thomas had barricaded the door to the apartment and would not let police officers into the apartment. Officer Fox also learned that Vanessa and Lawrence had been in the apartment but left because they were concerned for their safety. Officer Fox testified that, despite knowing that Vanessa and Lawrence left the apartment for safety reasons, officers nevertheless asked Vanessa to help them enter the apartment or coax Thomas out of the apartment.

Officer Fox testified that Vanessa, in helping officers enter the apartment, appeared to act in a way contrary to her own safety because she asked officers to allow her to enter the apartment alone and try to calm him down even though she knew that Thomas was armed with knives and a samurai sword.

¶ 15    After helping officers, Vanessa came out of the apartment building and stood with Officer Fox until Thomas was removed from the apartment. Vanessa was crying and upset. On direct examination, Officer Fox testified that she did not recall what she discussed with Vanessa during the hour-long period of time she remained with Vanessa outside the apartment building. On cross-examination, Officer Fox denied that Vanessa told her that Thomas struck her a day or two before.

¶ 16    Vanessa volunteered to go to the hospital, and Officer Fox drove her there. When they arrived at the hospital, they saw Thomas struggling with the officers who had transported him. Thomas appeared erratic and dangerous.

¶ 17    The hospital was well lit, and Officer Fox had a clear view of Vanessa's face and eye. However, she did not see any bruise or black eye on Vanessa.

¶ 18    Officer Fox spoke to medical staff, but not a doctor. She did not recall what she told them. On cross-examination, Officer Fox said she told the medical staff about Thomas's conduct and behavior at the apartment.

¶ 19    Officer Fox left the hospital at 11:49 p.m., about an hour past the end of her shift. Had she waited longer, she would have been hours past the end of her shift. No other officers remained with Vanessa after Officer Fox left. Officer Fox did not know how Vanessa would get home and took no action to arrange transportation for her.

¶ 20    Officer Fox knew that Thomas would undergo a mental health evaluation but "had no idea whether after that evaluation he would be detained or not." She believed that Thomas would be

held for 72 hours, but that was only an assumption. She could have initiated the paperwork required to involuntarily commit Thomas, but she did not and assumed Vanessa would do so. Given the danger posed by Thomas, she believed that Thomas should have been committed and "away from [Vanessa]" for at least 72 hours.

¶ 21    Officer Fox acknowledged that she was trained in how to comply with the Act and respond to domestic violence incidents. She knew that victims of domestic violence should be separated from their alleged abusers, that victims are reluctant to speak to police officers, and that victims need not affirmatively state that they have been abused for police officers to determine that an incident involves domestic abuse. Furthermore, the victim's refusal to sign a complaint does not defeat probable cause to make an arrest, and the decision to arrest an individual ultimately rests with the police officers, not the victim.

¶ 22    CPD regulations do not prevent arrests of mentally ill individuals. Officer Fox stated that it is common for her to take arrestees to the hospital where they are handcuffed in the hospital and at least one police officer waits for doctors to treat the arrestee. After treatment, arrestees are taken to the police station, where they remain in police custody. Additionally, in an arrest related to domestic violence, a bond must be set by a court, which can take an additional 24 hours. Along with a bond, it is also common for the court to set special conditions for an arrestee to stay away from the alleged victim.

¶ 23    Dr. Benjamin Soriano testified by video deposition that was played during the trial. He is a Cook County assistant medical examiner and performed Vanessa's autopsy on July 1, 2015. He determined that Vanessa's cause of death was asphyxiation due to ligature strangulation. He explained that it would take at least a minute or two to die from strangulation and that it was more likely true than not that Vanessa experienced conscious pain before she died.

6

¶ 24    He took an autopsy photo of Vanessa on July 1, which showed that Vanessa had a black eye and indicated injuries consistent with strangulation, including "pinpoint hemorrhages on the inner surface of the upper and lower eyelids."

¶ 25    A single autopsy photograph was admitted into evidence at trial over the City's objection. Prior to trial, the City had moved to bar use of the photograph—as well as other photographs the Estate's attorneys sought to admit—because the cause and manner of Vanessa's death were undisputed and the photograph would have an unduly prejudicial effect on the jury. The court admitted the autopsy photograph for identification purposes and to show the ligature marks.

¶ 26    Dr. Rashid Kysia testified that, on the evening of June 28, he was working in the emergency department at Stroger Hospital. Thomas arrived at the hospital at 10:48 p.m., and he treated him about an hour later. Dr. Kysia indicated that he had experienced cases before where a person in police custody was brought to the hospital for a mental health evaluation, not committed, and then taken back into police custody.

¶ 27    By the time Dr. Kysia treated Thomas, the medical staff had already administered an antipsychotic sedative to Thomas, and he was calm. When Dr. Kysia evaluated Thomas with the assistance of a psychiatrist, he only spoke to Vanessa and Thomas. There were no police officers present when Dr. Kysia evaluated Thomas. Dr. Kysia chose not to commit Thomas, in part because Vanessa advocated for his release and expressed that Thomas had to attend a job interview in the morning.

¶ 28    Dr. Kysia and other medical staff members noticed that Vanessa had a bruise under her eye. Dr. Kysia, a nurse, a social worker, and a resident all asked Vanessa about her bruise, but she denied it was caused by Thomas.

¶ 29    At the time of his evaluation, Dr. Kysia was not aware that Thomas had started a grease fire, attempted to make Molotov cocktails, brandished a sword, or barricaded himself in the apartment. This information was not relayed to him, nor was it in the medical record, which is where it would typically be documented if it was relayed to other medical staff.

¶ 30    Thomas was discharged from Stroger Hospital at 4 a.m. on June 29. He was not prescribed any antipsychotic medication upon discharge.

¶ 31    Steven, Vanessa's son, testified that around 2 a.m. on June 30, he received messages on the social media platform Facebook from Vanessa's account. The messages stated, "they're after me, part of the mob" and "My girlfriend was part of the mob. She came to kill me, so I killed her." Steven was on vacation when he received the messages, so he contacted his brothers Lawrence and Tawrence, who were in Chicago and had also seen the messages. Lawrence and Tawrence went to Vanessa's apartment. They then called Steven and told him that Thomas had strangled their mother.

¶ 32    Steven identified Vanessa on a 911 call she made at or around the time she was strangled. Vanessa can be heard screaming during the call.

¶ 33    The City objected to the admission of the 911 call based on relevance and prejudice, but the trial court admitted it into evidence, reasoning that any prejudice could be managed through an instruction to consider the recording for purposes of damages only. The 911 recording was played twice during the trial, first during the Estate's opening statement and second during Steven's testimony. In its posttrial motion, the City again challenged the introduction of the 911 call audio. The court denied the City's motion, finding that the recording was admissible as evidence of Vanessa's then-existing state of mind.

¶ 34    Officer Daniel Mieszcak testified that he arrived at Vanessa and Thomas's apartment at 2:33 a.m. on June 30 to do a well-being check. He had spoken to Lawrence, who told him about the messages that he and his brothers received on Facebook. There was smoke coming from the apartment when Officer Mieszcak arrived. The police officers were able to gain access to the apartment, but a struggle ensued with Thomas. Officers eventually arrested Thomas.

¶ 35    Vanessa was unresponsive, lying face down on the floor with a cable cord tied around her neck. Officer Mieszcak placed Thomas under arrest and charged him with murder despite his erratic behavior. Officer Mieszcak testified that mentally ill individuals can still commit crimes.

¶ 36    Lawrence testified that on June 28 he picked his mother up from work and drove her home. He noticed that she had a bruise under her left eye and said it looked like she had tried to cover it up with makeup. He asked her about the bruise, but Vanessa did not want to discuss it. When they got to the apartment building, they saw smoke coming from Vanessa and Thomas's apartment. Lawrence and Vanessa attempted to enter the apartment, but it was barricaded. Thomas initially refused to let them in but eventually did. Once inside the apartment, Lawrence saw that the stove was on and that Thomas was making crude Molotov cocktail bombs.

¶ 37    Lawrence turned the stove off. He then saw Thomas brandishing a samurai sword and knife. Vanessa attempted to grab the weapons from Thomas but was unsuccessful. Thomas told Lawrence to leave the apartment, but Lawrence did not want to leave without his mother. Thomas would not let Vanessa leave with Lawrence, so Lawrence remained with Vanessa. After five or six minutes, Thomas allowed Lawrence and Vanessa to leave the apartment.

¶ 38    Afraid for their safety, Lawrence called 911. After observing Thomas's erratic behavior, Lawrence again asked Vanessa about the bruise under her eye. Vanessa told him that the previous evening she had woken up and observed smoke in the apartment. Thomas was playing with the

stove and appeared to be trying to cause an explosion. Vanessa struck Thomas in an attempt to stop him, at which point Thomas hit Vanessa in her left eye.

¶ 39 An ambulance arrived at the apartment in response to Lawrence's 911 call. Lawrence told the paramedics that Thomas was dangerous, so the paramedics waited for police officers to arrive. When Officer Fox arrived, Lawrence told her what had occurred inside the apartment and said she would need backup. After more officers arrived, they attempted to enter the apartment. After a failed attempt, police officers took Vanessa's keys and asked her to come with them so she could attempt to calm Thomas down. When Vanessa's presence failed to calm Thomas down, Officer Fox brought Vanessa downstairs. Lawrence testified that Officer Fox observed that Vanessa had a black eye and asked, "do you feel safe?" Vanessa did not respond. Lawrence then told Officer Fox what his mother had told him about how Thomas gave her a black eye. Officer Fox took Vanessa aside to talk to her. Two male officers then asked Lawrence about Vanessa's black eye, and he relayed what Vanessa had told him.

¶ 40 After Thomas was placed in the police squadrol to be taken to Stroger Hospital, Officer Fox suggested that Vanessa come to the hospital. Lawrence believed that Thomas would be arrested after going to the hospital.

¶ 41 On June 30, Lawrence saw the messages coming from Vanessa's Facebook account. Lawrence and his brother identified Vanessa's body at the morgue. Lawrence testified that he observed the same bruise on Vanessa's eye, although it was not as visible as it was on June 28.

¶ 42 The City moved *in limine* to bar Lawrence from testifying that Vanessa told him Thomas had struck her prior to June 28. The court denied the City's motion, stating:

"They want the statement from . . . [Vanessa]? The decedent? That 'Mr. [Thomas] hit me two days ago,' then it's either coming in under [Ill. Sup. Ct. R.] 801 or 803. If [the Estate

doesn't] lay the foundation for it substantively, then I will tell the jury to disregard... either lay the foundation for an 801 exemption or an 803 exception. 803(3) might work. I don't know. But I think [Lawrence]'s state of mind might be important."

The City continued to object, noting that the court's ruling would allow the statement to come out regardless of whether it was properly admissible or not. The City similarly moved to bar the testimony that Lawrence told the officers that Thomas had hit Vanessa the day before. The court denied the City's motion, stating the testimony could come in substantively if the proper foundation was laid or, if the proper foundation was not laid, with limiting instructions.

¶ 43 After Lawrence's testimony concluded, the trial court ruled that his testimony was inadmissible hearsay, stating:

"There are motions *in limine* regarding certain hearsay statements that occurred prior to the June 28th incident. I think the date that—it does vary, but approximately June 26th. So respectfully, during motions *in limine* I said so long as you lay the foundation for substantive, which was not done, then I'm going to give you a limiting instruction. Here's the limiting instruction. No foundation was laid for the statement that Mr. Lawrence had said regarding that alleged violence either as an 801 exemption or an 803 exception. So therefore, because it's not substantive, it is still hearsay. I have to give a limiting instruction. I'm going to give the limiting instruction."

The trial court then instructed the jury:

"So there was some testimony by witnesses regarding an alleged domestic violence incident between James Thomas and Vanessa Taylor before June 28, 2015. Now, that evidence is not substantive evidence. It is merely to be considered by you as to the weight to be given to that witness' testimony."

¶ 44    The Estate then rested its case.

¶ 45                                B. The City's Case

¶ 46    Aileen Robinson testified that she worked as the City of Chicago's domestic violence coordinator and explained that, if a person qualifies as an abused person under the Act, officers are trained to separate the parties and then take mandated steps, including offering information, services, and legal protection. Robinson further testified that one of the reasons compliance with the Act is necessary is because of intrafamily homicide, which the statute specifically addresses.

¶ 47    Robinson testified that domestic violence incidents have two components: (1) the parties have a relationship defined under the Act and (2) a crime has occurred. Officers determine if a crime has occurred by speaking with the parties and witnesses and assessing the circumstances. Robinson testified that she reviewed the CPD incident report documenting the June 28, 2015, incident involving Thomas, Vanessa, and Lawrence on a "non-criminal mental health transport form" and concluded that this was not a domestic violence incident. In reviewing the incident report, Robinson testified that Lawrence and Thomas did not have a relationship as defined under the Act and therefore the first element of domestic violence under the Act was absent. The CPD incident report states that Thomas was the offender, Lawrence was the victim, and Vanessa was the witness. There is no Act-protected relationship between a "non-live in adult child of a woman and her boyfriend." Robinson acknowledged that the only basis for her conclusion that this was not a domestic violence incident was the report and that she had not reviewed any other sources of information.

¶ 48    She indicated that all domestic violence calls are considered "priority 1A" but that not every "domestic" call involves domestic violence. A victim's refusal to sign a complaint does not

defeat probable cause, and officers should not base their decision to arrest on whether the case will be prosecuted. Domestic violence calls can also involve requests for mental health assistance.

¶ 49    Dr. Monica Argumedo, the City's expert witness, testified that, after a review of the record in this case, Dr. Kysia had sufficient evidence to civilly commit Thomas. Thomas was suffering from psychosis, was hearing voices, was delusional, and had been paranoid for at least three or four weeks. Thomas's paranoia that someone in the mob was trying to kill him put him at risk of harming himself and others because Thomas would want to defend himself. Dr. Argumedo agreed that the antipsychotic medication given to him in the emergency room could have masked Thomas's symptoms but that Dr. Kysia should have known that Thomas was a danger to himself or others, including Vanessa.

¶ 50    On cross-examination, Dr. Argumedo explained that most mental health examinations of people charged with crimes are done in a custodial setting and that, when a defendant is found unfit to stand trial, the defendant is transferred to a mental health facility, not released from custody. Dr. Argumedo agreed that the medical records that she reviewed did not indicate that Thomas was making Molotov cocktails or brandishing a Samurai sword and knives and that this information would have been helpful in deciding whether to civilly commit a patient. She also agreed that, had officers remained at the hospital for Thomas's mental health evaluation, they would have been a helpful resource for consultation about Thomas's actions that night.

¶ 51    The City then rested. The Estate offered no evidence in rebuttal.

¶ 52                          II. ANALYSIS

¶ 53    On appeal, the City advances two grounds of trial court error. First, it contends that the trial court erred by not granting its motion for judgment notwithstanding the verdict because the Estate failed to offer sufficient evidence to establish the elements of a cause of action under the Act.

13

Second, it contends that the trial court erred by not granting its motion for a new trial because the verdict was against the manifest weight of the evidence and that the trial court erred in admitting the photo of Vanessa's body at the morgue, the audio of Vanessa's 911 call, and hearsay testimony offered by Lawrence. We address these arguments in turn.

¶ 54        A. The City Was Not Entitled to Judgment Notwithstanding the Verdict

¶ 55     In its motion for JNOV, the City argued that the Estate failed to satisfy the elements of its civil claim against the City under the Act. We review the trial court's denial of the City's motion for JNOV *de novo. Northern Trust Co. v. University of Chicago Hospitals & Clinics*, 355 Ill. App. 3d 230, 241 (2004). When deciding a motion for JNOV, the trial court "may not reweigh the evidence and set aside the verdict simply because a jury could have drawn different conclusions or inferences from the evidence or because it feels other possible results may have been more reasonable." *Id.* JNOV may not be entered "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." (Internal quotation marks omitted.) *Id.* at 242-43. Stated conversely, JNOV is appropriate only "in those *** cases where all of the evidence, when reviewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992).

¶ 56     Fourteen legal aid, social services, and legal advocacy organizations that represent, serve, and advocate on behalf of victims of domestic violence have filed an *amicus* brief in support of the Estate. They are Legal Aid Chicago, Ascend Justice, Chicago Alliance Against Sexual Exploitation, Chicago Appleseed Center for Fair Courts, Chicago Council of Lawyers, Illinois

Coalition Against Domestic Violence, Land of Lincon Legal Aid, The Legal Aid Society of Metropolitan Family Services, Life Span, Mujeres Latinas En Accion, The Network: Advocating Against Domestic Violence, Resilience, Prairie State Legal Services, and Sarah's Inn. *Amici*'s analysis of the legislative history and purpose of the Act is helpful in defining the contours of the elements of a civil claim under the Act and its application to the evidence in this case.

¶ 57    To establish liability under the Act, a plaintiff must show (1) she is a person in need of protection under the Act, (2) the statutory law enforcement duties owed to her were breached, (3) these duties were breached by the willful and wanton acts or omissions of law enforcement, and (4) such conduct proximately caused plaintiff's injuries. See *Moore v. Green*, 219 Ill. 2d 470, 484 (2006).

¶ 58           1. Vanessa Was a Person in Need of Protection Under the Act

¶ 59    Under the Act, law enforcement officers "shall immediately use all reasonable means to prevent *** abuse, neglect, or exploitation" when they have "reason to believe that a person has been abused, neglected, or exploited by a family or household member." 750 ILCS 60/304(a) (West 2014). "Abuse," in turn, means "physical abuse, harassment, *** [or] interference with personal liberty." *Id*. § 103(1). Physical abuse, in turn, means "knowing or reckless use of physical force, confinement or restraint" or "knowing or reckless conduct which creates an immediate risk of physical harm." *Id.* § 103(14)(i), (iii). "Harassment," in turn, means:

> "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner. Unless the presumption is rebutted by a preponderance of the evidence, the following types of conduct shall be presumed to cause emotional distress:

15

* * *

(vi) threatening physical force, confinement, or restraint on one or more occasions." *Id.* § 103(7)(vi).

Finally, "interference with personal liberty," in turn, means "committing or threatening physical abuse, harassment, intimidation or willful deprivation so as to compel another to engage in conduct from which she or he has a right to abstain or to refrain from conduct in which she or he has a right to engage." *Id.* § 103(9).

¶ 60    The City contends that, under these statutory definitions, an abuser's conduct toward a victim must be knowing or reckless. According to the City, the officers responding to Vanessa and Thomas's residence on June 28, 2015, had no reason to believe that Vanessa was an abused person under the Act because Thomas was suffering from a mental health crisis and therefore lacked the necessary mental state to commit "abuse" under the Act. In support, the City points to the jury instruction given in this case:

"A person knows or acts knowingly or with knowledge of the nature of attendant circumstances of his or her conduct described by the statute defining the offense when he or she is consciously aware that circumstances exist.

A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation."

The City argues that Thomas's words and actions demonstrate that he was not acting with conscious awareness or conscious disregard and, therefore, responding officers would not have

16

had reason to believe he was capable of committing abuse as defined by the Act. The City highlights evidence showing that Thomas was "out of this mind," had not slept in three days, had been consuming alcohol, had been burning grease, and had been paranoid about people killing him and that Vanessa asked for an ambulance on June 28, 2015, indicating she believed Thomas needed medical help. Moreover, when officers arrived on the scene, Thomas had barricaded himself in the apartment and told officers they would have to burn him out. Moreover, Thomas's hospital records indicated that he was paranoid, delusional, and "responding to auditory hallucinations."

¶ 61　The Estate responds that the City's construction of the Act is myopic because it narrowly focuses on the *scienter* requirement of the terms "physical abuse" and "harassment" as defined by the Act and fails to acknowledge that "interference with personal liberty" does not include the *scienter* requirement that the conduct must be knowing or reckless. Therefore, the undisputed evidence showing that Thomas interfered with Vanessa's personal liberty by refusing to let her leave the apartment supports a finding of abuse under the Act, regardless of Thomas's mental state. What is more, Officer Paxson admitted that Thomas's actions were "reckless." Therefore, irrespective of Thomas's mental health crisis, the evidence at trial established that he acted in a manner that would satisfy the definitions of abuse and harassment under the Act.

¶ 62　We are not persuaded by the City's argument that the protections provided for in the Act to victims of abuse are not available when the abuser is experiencing a mental health crisis like Thomas appeared to be experiencing here. Because this issue is one of statutory interpretation, our review is *de novo. Dome Tax Services Co. v. Weber*, 2019 IL App (3d) 170767, ¶ 10. When we interpret statutes, we must ascertain and give effect to the intent of the legislature. *Id.* One of the purposes of the Act is "to provide victims of domestic violence with the highest level of protection possible." *Sanchez v. Torres*, 2016 IL (1st) 151189, ¶ 14. The Act begins with a directive that it is

17

to be "liberally construed and applied to promote its underlying purposes," which include: "[c]larify[ing] the responsibilities and support the efforts of law enforcement officers to provide immediate, effective assistance and protection for victims of domestic violence"; "[r]ecogniz[ing] domestic violence as a serious crime against the individual and society which *** promotes a pattern of escalating violence"; and recognizing that "although many laws have changed, in practice there is still widespread failure to appropriately protect and assist victims." 750 ILCS 60/102 (West 2014). When we consider the broad purposes of the Act, including its goal of "provid[ing] victims of domestic violence with the highest level of protection possible" (*Sanchez*, 2016 IL (1st) 151189, ¶ 14), we find no reason to disturb the jury's finding that Vanessa was a person in need of protection under the Act and, therefore, the City owed her a duty, irrespective of Thomas's mental health crisis. Contrary to the City's assertions, nothing in the language of the Act leads to the conclusion that an abuser suffering from a mental health crisis cannot commit abuse.

¶ 63    As *amici* explain, scholars have observed:

> "People with mental disorders are not automatons; rather, they are agents who act for reasons. Their reasons may be motivated by distorted perceptions and beliefs, but *they do form intentions* and have knowledge of what they are doing in the narrow, most literal sense. Thus, it is very uncommon for mental disorder to negate all *mens rea*, even if the defendant is profoundly delusional ***." (Emphasis added.) Stephen J. Morse & Morris B. Hoffman, *The Uneasy Entente Between Legal Insanity and* Mens Rea*: Beyond* Clark v. Arizona, 97 J. Crim. L. & Criminology 1071, 1096-97 (2007).

Our conclusion is supported by the law of the insanity defense. Illinois courts have recognized that "even the criminally insane defendant is often perfectly capable of forming the requisite intent to commit a crime." *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 161 (citing *People v. Hightower*,

172 Ill. App. 3d 678, 686-87 (1988) ("The Illinois Courts and the Illinois Legislature ha[ve] made a distinction between *mens rea* and sanity. *** A defendant can perform an intended act whether or not he recognizes the moral or social implications of the act.")). Although "a person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct" (720 ILCS 5/6-2(a) (West 2022)), when a defendant invokes an insanity defense, "the State [must first] prove[ ] the defendant guilty beyond a reasonable doubt of the offense with which [the defendant] is charged." *Id.* § 6-2(e). Thus, the State must prove, and a jury must first find that a person had the requisite *mens rea* before a jury can consider whether "mental disease or mental defect" absolves the defendant from culpability. And even in cases where the defendant has not proven the insanity defense, but the defendant has provided sufficient evidence of a mental illness, a jury or trial court may find a defendant guilty but mentally ill. *People v. Gindorf*, 159 Ill. App. 3d 647, 656 (1987); see also 720 ILCS 5/6-2(c) (West 2022) ("A person who, at the time of the commission of a criminal offense, was not insane but was suffering from a mental illness, is not relieved of criminal responsibility for his conduct and may be found guilty but mentally ill."). While a verdict of guilty but mentally ill recognizes that the defendant has a mental illness, it does not relieve the defendant of criminal responsibility or culpability like the insanity defense. *Gindorf*, 159 Ill. App. 3d at 656. Thus, a defendant who is ultimately found not guilty by reason of insanity must still have possessed the requisite *mens rea* to commit the offense, even if he failed to appreciate the criminality of his conduct. Similarly, a person may be found to possess the requisite *mens rea* to commit abuse under the Act even when he is experiencing a mental health crisis.

¶ 64    Here, we are neither concerned with Thomas's criminal liability for his conduct on June 28, 2015, nor his criminal liability for Vanessa's murder on June 30, 2015. Rather, our review is

limited to whether Thomas's apparent mental health crisis is inconsistent as a matter of law with a finding that Thomas possessed the necessary mental state to abuse Vanessa. Because Thomas's mental state does not necessarily preclude his criminal liability, it stands to reason that his mental state does not preclude the factfinder from concluding that he acted with conscious awareness or disregard as required by the Act.

¶ 65 Here, although the evidence strongly indicates that Thomas was suffering from an acute mental health crisis, it also supports a finding that he acted knowingly or recklessly towards Vanessa and that his actions satisfy the definition of "abuse" under the Act. We agree with *amici* that the Act's "primary focus is assisting and protecting victims of domestic violence from harm, and the danger posed by a perpetrator of domestic violence is in no way mitigated simply because the abuser is delusional or paranoid—*the danger may, in fact, be starker in such cases*." (Emphasis added.) The City's attempt to avoid liability under the Act based on its officers' perception that Thomas's actions were not criminal is entirely at odds with the purpose of the Act and its mandate that law enforcement officers, among other things, take all reasonable steps to protect victims of domestic violence. We reject the City's position that, once it decided to treat Thomas not as a criminal but a person in mental health crisis, it was absolved of its duty to take reasonable steps to protect Vanessa under the Act. Nothing in the Act supports the City's zero-sum game approach to domestic violence committed by one in mental health crisis. The protections afforded under the Act to victims of domestic abuse do not depend on the mental health status of their abusers.

¶ 66 We, therefore, reject the City's assertion that Thomas could not have committed physical abuse or harassment under the Act because he was experiencing a mental health crisis.

¶ 67 Citing *People v. Lee*, 2017 IL App (1st) 151652, the City argues that the Act does not require officers to criminalize a mental health crisis. There, in a special concurrence in a case

where we reversed the conviction of a defendant with schizophrenia based on the absence of evidence that the defendant was consciously aware of his actions, Justice Michael Hyman urged prosecutors to critically consider a person's mental condition and intent before filing charges. *Id.* ¶¶ 30-32 (Hyman, J., specially concurring). However, *Lee* is inapposite because, as we explain below, although officers were not necessarily required to arrest Thomas, nor were they permitted to simply walk away shortly after taking Thomas to the hospital.

¶ 68 In addition, the City relies on *People v. Davidson*, 2023 IL 127538, for the proposition that context matters in determining whether a reasonable person would believe a crime has been committed in order to justify the officers' failure to take additional steps to protect Vanessa. As we explained above, however, the jury heard evidence of the context surrounding Thomas's actions, including evidence of his mental state, and it was within the jury's purview to determine whether in that context Thomas's conduct towards Vanessa constituted abuse. The jury found Vanessa was a victim of abuse under the Act, and the City has not offered any plausible basis for us not to defer to the jury's finding.

¶ 69 Finally, pointing to Vanessa's request that Thomas not be arrested, the City argues that officers should not be required to disregard victims' requests when determining whether they are victims of abuse. See *Fenton v. City of Chicago*, 2013 IL App (1st) 111596, ¶ 21 (stating that it is of critical importance for responding officers to interview household members to understand their version of events). However, under the Act, when law enforcement officers have "reason to believe" a person has been abused, it is their duty to take all reasonable steps to ensure that victims are not further harmed. This is so even when victims do not self-identify and even when they exhibit counterintuitive behavior when interacting with officers, including minimizing or denying the abuse. *Cf. People v. Jenk*, 2016 IL App (1st) 143177, ¶¶ 5, 48-50 (rejecting challenge to

21

sufficiency of evidence against defendant where domestic battery victim, who loved defendant despite defendant having previously battered her on several occasions, falsely told hospital personnel and police that she was "jumped" by an unknown assailant in order to protect defendant); *People v. Ward*, 2021 IL App (2d) 190243, ¶ 94 (Zenoff, J., concurring in part and dissenting in part) ("victims of domestic violence often feel a sense of loyalty to their abusers, [so] they may protect the abusive family member by denying, minimizing, or recanting their earlier reports of domestic violence"); *People v. Appelt*, 2013 IL App (4th) 120394, ¶ 66 ("[V]ictims of domestic violence can be very forgiving. After their bruises heal and some time passes, they commonly change their mind about testifying against the loved one who beat them up."); *State v. Townsend*, 897 A.2d 316 (N.J. 2006) (shortly before dying from injuries inflicted by her husband, which her children witnessed, domestic violence victim falsely stated she had been struck by a car); *State v. Borelli*, 629 A.2d 1105, 1107, 1114 (Conn. 1993) (victim signed police statement describing horrific abuse, then recanted at trial and said the events had never happened). Notwithstanding any denial by Vanessa that she was a victim of domestic violence or her genuine desire to get Thomas mental health help, as long as officers had a reason to believe she was an abused person under the Act, they were required to take all reasonable steps to prevent further harm.

¶ 70 We now turn to the jury's finding that Vanessa was a person in need of protection under the Act and that as a result officers owed Vanessa a duty under the Act. Our review on appeal is dictated by a well-established standard of review. While we review the trial court's denial of JNOV *de novo*, we defer to the jury's factual findings unless the "evidence, when viewed in its aspect most favorable to the opponent, so *overwhelmingly* favors the movant that no contrary verdict based on that evidence could ever stand." (Emphasis added and internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 453. The City does not dispute that Thomas's conduct in confining Vanessa

in their apartment while bearing a sword and knife constitutes abuse under the Act. And although the City contends that police officers did not know about the bruise by Vanessa's eye or know that Thomas hit Vanessa in the eye one day earlier, it does not dispute that this conduct would constitute abuse under the Act. Therefore, because the evidence supports the jury's decision that the City owed Vanessa a duty, we find JNOV was not warranted here.

¶ 71    2. The City's Liability Is Based on Its Failure to Take Reasonable Steps

to Protect Vanessa on June 28-29, 2015, Not Its Failure to Protect Vanessa on

the Date of Her Death

¶ 72    The City next argues that, regardless of whether officers owed Vanessa a duty under the Act, it may not be held liable because the officers were not "rendering emergency assistance or otherwise enforcing" the Act (750 ILCS 60/305 (West 2014)) when Thomas killed Vanessa on June 30, 2015. The two cases cited by the City are critically distinguishable.

¶ 73    In *Lacey v. Village of Palatine*, 232 Ill. 2d 349, 367-68 (2009), our supreme court held that, because the duty imposed on police officers under the Act is not a general ongoing duty to victims of domestic violence, any duty the officers owed to the victims ended before the eventual death of the two victims, which occurred almost two months after the officers' initial contact with them. It reasoned that, if the contrary result was reached, then it "would create a situation where once officers were aware of the potential for violence, they would remain liable for the prevention of that violence for an indefinite period of time." *Id. Lacey* is distinguishable because, there, the "otherwise enforcing" portion of the Act was implicated, whereas here, the "rendering emergency assistance" provision applies. See 750 ILCS 60/305 (West 2014) ("Any act of omission or commission by any law enforcement officer acting in good faith in *rendering emergency assistance or otherwise enforcing* this Act shall not impose civil liability upon the law enforcement

23

officer or his or her supervisor or employer, unless the act is a result of willful or wanton misconduct." (Emphasis added.)) Here, the officers failed to fulfill their duty to use all reasonable means to protect Vanessa in the late evening hours of June 28 and early morning hours of June 29, 2015, when the officers were rendering emergency assistance to her. The Estate did not argue— nor do we find—that the officers had an ongoing duty to protect Vanessa that extended until June 30, 2015, as the City asserts. Nor do we find that officers have an unending duty under the Act to protect victims of domestic violence.

¶ 74    In the second case cited by the City, *Fenton*, we recognized that officers do not have an ongoing duty to protect domestic violence victims but concluded that police officers breached their duty when they failed to protect the victim who was murdered six minutes after police officers left the scene. *Fenton*, 2013 IL App (1st) 111596, ¶ 29. The court specifically stated that the "timeline [was] articulated in minutes, not days, weeks or months" and therefore found the facts distinguishable from *Lacey. Id.* The City argues that, because the officers were no longer rendering emergency assistance or enforcing the Act on June 30, they owed no duty to Vanessa. Again, the Estate does not contend that the officers had an ongoing duty to protect Vanessa after they left her at the hospital but instead that they breached their duty to do more to protect her before they ended their emergency response on the morning of June 29. It is the adequacy of the officers' emergency response at those times that is the subject of this case. As we explain below, a jury could have reasonably concluded that, if the officers had taken additional reasonable steps to protect Vanessa on an emergent basis, then Thomas would likely not have been able to kill Vanessa some 25 hours later. Thus, the fact that Vanessa's death occurred 25 hours after the officer's initial emergency response has no bearing on whether the officers owed her a duty (and breached that duty) under the Act on June 28.

¶ 75                   3. Officers' Acts and Omissions Were Willful and Wanton

¶ 76    The City argues that the evidence offered by the Estate was insufficient to establish that its officers acted willfully and wantonly. The jury was instructed that "willful and wanton" means "a course of action which shows utter indifference to or conscious disregard for a person's own safety and the safety of others." Our supreme court has recognized a gray area between negligent conduct and willful and wanton misconduct and has stated that a plaintiff need not prove intentional conduct in order to prove willful and wanton misconduct, as it properly occupies that area between simple negligence and intentional wrongdoing. *Fenton*, 2013 IL App (1st) 111596, ¶ 19. Whether conduct was willful and wanton is ordinarily a question of fact left for the trier of fact (*Hatteberg v. Cundiff*, 2012 IL App (4th) 110417, ¶ 30), and we will only disturb that finding "where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 453.

¶ 77    The City argues the facts here support a finding that its officers' actions were not willful and wanton because the officers investigated after they received the 911 call and spoke to witnesses, Officer Fox remained with Vanessa for three hours, Vanessa was the one who confirmed that Thomas was suffering from a mental health episode, Vanessa requested that Thomas not be arrested, and medical professionals in addition to Officers Paxson and Fox determined that Vanessa was not a victim of abuse. It contends that taking Thomas to the hospital absolves its officers of liability under the Act and that the officers' conduct cannot be willful or wanton because, when they left the scene, Thomas was already sedated and strapped to a hospital bed.

¶ 78    The Estate argues that the jury heard sufficient evidence to support its finding that the officers did in fact engage in willful and wanton misconduct. In support, the Estate points out that the officers did not separate Vanessa from Thomas as they were instructed in their training on responding to domestic calls and enforcing the Act, used Vanessa to help gain access to the apartment, took Vanessa to the hospital, left her there without any further assistance, and failed to fully inform medical staff of the extent of Thomas's erratic and dangerous behavior on June 28, 2015.

¶ 79    The evidence here was sufficient for the jury to find that the officers' conduct was willful and wanton. The Act prescribes that officers "shall use *all reasonable* means to prevent further abuse" (emphasis added) and specifies seven nonexclusive means of doing so (750 ILCS 60/304(1)-(7) (West 2014)). The officers exercised one of these options by taking Thomas to the hospital for an evaluation and by taking weapons away from him (*id*. § 304(a)(2)). However, the officers failed to use "*all* reasonable means" to prevent harm or to fulfill their statutory duty under the Act in several critical aspects. Evidence in the record demonstrates that police did not fully inform the hospital of Thomas's violent behaviors that they witnessed, did not remain in the hospital long enough to find out the results of the mental health evaluation, did not take any steps to ensure that paperwork to civilly commit Thomas was completed by someone, and did not wait to determine whether any further action on their part was required to protect Vanessa in the event that Stroger Hospital medical staff decided not to civilly commit Thomas.

¶ 80    The Act specifically outlines several other "reasonable means to prevent further abuse" that the officers could and should have employed, including accompanying Vanessa to her place of residence to gather personal belongings, offering her information about emergency orders of protection, providing her with a referral to a service agency, advising her about seeking medical

26

attention, and providing or arranging transportation for her to a medical facility or a nearby place of shelter or safety. *Id*. § 304(a)(1)-(7). The officers took none of these steps. See *Fenton*, 2013 IL App (1st) 111596, ¶ 22 (the court had no difficulty deferring to the jury's willful and wanton finding where the officers had to respond to the same incident twice and nevertheless left the aggressor to wait for his girlfriend outside the victim's home instead of placing him under arrest). The undisputed facts about what actions the officers took and did not take, coupled with the evidence adduced at trial that Officer Paxson was at the end of his shift going into "his weekend" and that Officer Fox's shift ended while she was still at the hospital, provided sufficient evidence for the jury to infer that the officers were more interested in going home than in complying with their obligations under the Act to take reasonable measures to protect Vanessa. Under these circumstances, the evidence was sufficient for the jury to find that the officers' conduct was willful and wanton.

¶ 81    The City relies on *Gary v. City of Calumet City*, 2020 IL App (1st) 191812, ¶ 42, where we found that paramedics did not engage in willful and wanton acts or omissions when they made extensive efforts to save the decedent's life even though those efforts were unsuccessful. *Gray* is unavailing, however, because it was not a case brought under the Act, where the source of the duty is statutory and requires "all reasonable means to prevent further abuse." Even if we were to find *Gary* relevant, the case hinges on a finding that the paramedics provided sufficient medical care given the circumstances. Here, it was within the purview of the jury to determine that Chicago police officers did not fulfill their duty to Vanessa given the circumstances. We have no reason to disturb that finding.

¶ 82          4. The Officers' Failure to Perform Their Duties Under the Act

Was the Proximate Cause of Vanessa's Death

¶ 83    For its final argument in support of JNOV, the City contends that its officers' violation of the Act did not proximately cause Vanessa's death. Proximate cause is ordinarily a question of fact to be determined by the trier of fact (*Schultz v. St. Clair County*, 2022 IL 126856, ¶ 37), and we will not disturb the jury's finding unless "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Maple*, 151 Ill. 2d at 453. The jury was instructed that the proximate cause "need not be the only cause, nor the last or nearest cause," and that it "is sufficient if it combines with another cause resulting in the injury." Proximate cause has two distinct requirements: cause in fact and legal cause. *Id.* A defendant's conduct is the cause in fact of the injury only if the conduct is a material element and substantial factor in bringing about the injury and if, absent the conduct, the injury would not have occurred. *Id.* If actual cause is proven, then the question is whether the defendant should be legally responsible for it. *Id.* Legal cause involves an assessment of foreseeability. *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 24. "Courts ask whether the injury is of the type that a reasonable person would see as a likely result of his or her conduct, or whether the injury is so highly extraordinary that imposing liability is not justified." (Internal quotation marks omitted.) *Id.*

¶ 84    The City argues that the Estate failed to prove cause in fact because the officers who transported Thomas to Stroger Hospital while he was in a mental health crisis could not have been a *substantial factor* in Thomas killing Vanessa. The Estate challenges the City's framing of the issue and instead asserts that the question is whether the officers' breach of duty under the Act on June 28 and 29, 2015, was a material element and substantial factor in bringing about Vanessa's

28

death. We agree with the Estate's framing of the issue and find that the officers' failure to fulfill their duties under the Act was a substantial factor in bringing about Vanessa's death. As explained above, there is sufficient evidence to support the jury's finding that the officers breached the duty they owed Vanessa. Moreover, the jury could have reasonably concluded that, absent the officers' breach of their duty to Vanessa, Thomas would not have been able to kill Vanessa. If the officers had arrested Thomas, ensured that Thomas was civilly committed, or taken other reasonable steps to protect Vanessa, including, but not limited to, informing Vanessa of how to obtain an order of protection and/or transporting her to a safe place, Thomas would not have had the opportunity to kill Vanessa on June 30, 2015.

¶ 85    The City relies on *Schultz*, 2022 IL 126856, ¶ 38, in which our supreme court explained that "[t]he cause of an injury is that which actually produces it, while the occasion is that which provides an opportunity for causal agencies to act." (Internal quotation marks omitted.) The court reasoned that conduct is not the proximate cause of an injury if a defendant's conduct "does nothing more than furnish a *condition* by which injury is made possible." (Emphasis added and internal quotation marks omitted.) *Id.* ¶¶ 37-38. The court found that a county's refusal to dispatch an officer was not the proximate cause of the decedent's death because the decedent was intoxicated, the decedent had driven off the road due to the intoxication, and decedent's husband— who was not with her at the time of the accident but called 911—did not have her exact location when asking for assistance. *Id.* ¶ 40. The court found that the sole cause of the injury was the decedent's decision to drive intoxicated and that, at most, the county's conduct merely furnished a condition that made the injury possible. *Id.*

¶ 86    We find *Schultz* distinguishable because it is not an Act case, where the duties owed to victims of abuse are broader in that officers are required to take all reasonable measures to protect

29

domestic violence victims from harm. Moreover, the lack of response from the county in *Schultz* is a far cry from the woefully inadequate response from the officers here, who were fully aware of the dangerous circumstances that necessitated their emergency response yet failed to exercise reasonable options to protect Vanessa from further harm.

¶ 87 The City also argues the hospital's decision to "release Thomas without any treatment" was not the "likely result" of its officers' failure to provide the hospital staff with additional information about Thomas's behavior. The City asserts that, because the hospital staff—and in particular Dr. Kysia—knew that Thomas was delusional, paranoid, and responding to auditory hallucinations when they released him, it was a failing on the part of the hospital staff, who made the decision to release Thomas despite having sufficient information to civilly commit him, which caused Vanessa's death. The Estate responds that any blame the City casts on Dr. Kysia for deciding not to civilly commit Thomas is not a valid defense, because unlike the officers, Dr. Kysia owed no duties to Vanessa under the Act. Moreover, it was within the jury's purview to credit Dr. Kysia's testimony that he was not fully informed by officers of Thomas's dangerous actions. The Estate further argues the officers reasonably should have anticipated that Thomas might harm Vanessa because the City trains officers to comply with the Act, Officer Paxson admitted he had a copy of the statute with him when he responded to the scene on June 28, and the Act specifically warns that domestic abuse can lead to intrafamily homicide. 750 ILCS 60/102(1) (West 2014).

¶ 88 We also see no reason to disturb the jury's finding that the officers' conduct was a legal cause of Vanessa's death. A reasonable jury could find that it was foreseeable that Thomas would harm Vanessa if officers failed to "use all reasonable means to prevent further abuse." Ample evidence showed that Thomas—regardless of his mental state—was dangerous and could harm Vanessa. Officers Paxson and Fox acknowledged as much. Thomas was brandishing weapons,

burning grease and cloth, and had prevented Vanessa and Lawrence from leaving the apartment for five to six minutes. Thomas struggled with and injured an officer when he was being taken to the hospital, and multiple officers and medical staff were needed to strap him down to a bed at the hospital. This evidence, taken together, supports the jury's finding that it was reasonably foreseeable that Vanessa would be harmed or killed if the officers failed to fulfill their duties under the Act.

¶ 89    We conclude that the circuit court did not err in denying the City's motion for JNOV.

¶ 90                    B. The City Was Not Entitled to a New Trial

¶ 91    The City moved for a new trial raising several arguments, including that the verdict was against the manifest weight of the evidence and that the trial court erred in admitting a photo of Vanessa at the morgue, the audio of Vanessa's 911 call, and hearsay testimony offered by Lawrence. On appeal, the City challenges the trial court's denial of its motion for a new trial based on these same claims of errors. The Estate argues that the photo, 911 call audio, and hearsay statements are admissible, but even if they were inadmissible as the City contends, the admission of each was harmless, and the jury's verdict was not against the manifest weight of the evidence.

¶ 92                    1. The Photo Was Admissible as Relevant Evidence

¶ 93    The trial court admitted one autopsy photo of Vanessa for "identity" purposes. A trial court's decision to admit relevant evidence, including photographs, will not be disturbed absent an abuse of discretion. *People v. Himber*, 2020 IL App (1st) 162182, ¶ 44. Evidence is relevant if it has the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

31

¶ 94    The City argues that the autopsy photograph was not relevant because Vanessa's cause of death was not disputed and there was no reason the jury needed to see her photograph for identification purposes. While we agree the photograph was not relevant to Vanessa's cause of death or identification, it was nevertheless relevant to the dispute over whether Vanessa had a bruise under her eye when officers arrived on the scene on June 28. The evidence at trial showed that Lawrence observed a bruise underneath Vanessa's eye on June 28 and that he saw this same bruise underneath her eye at the morgue. Dr. Kysia testified that he also saw the bruise underneath Vanessa's eye and that other medical staff did as well. However, Officers Paxson and Fox denied seeing any bruise underneath Vanessa's eye. The presence of bruising under her eye was relevant to the jury's determination of whether the officers owed Vanessa a duty under the Act when they responded on June 28. Therefore, the photograph is relevant because it supports the Estate's theory that the police owed a duty to Vanessa under the Act because she had a black eye when officers responded on June 28.

¶ 95    Irrespective of relevance, photographic evidence may nevertheless be excluded if the prejudicial nature of the photograph outweighs the probative value. *Himber*, 2020 IL App (1st) 162182, ¶ 44. The City asserts that the photograph, even if relevant, is prejudicial because it is gruesome and graphic and because it does not depict Vanessa's bruise on June 28. A photograph "may be admitted in spite of the fact that the photograph may be gruesome or inflammatory." (Internal quotation marks omitted.) *People v. Scott*, 148 Ill. 2d 479, 546-47 (1992). While the photo depicts some of the injuries Vanessa suffered, it appears relatively clinical in that it reflects the condition of her body after autopsy and is not as gruesome or graphic as the City contends. Moreover, it clearly shows the bruise underneath Vanessa's eye.

¶ 96    The City also argues that the probative value of the photograph does not outweigh its prejudicial effect because it was taken on July 1 and the issue here was whether Vanessa had a black eye on June 28. However, the photograph was introduced to support Lawrence and Dr. Kysia's testimony that Vanessa had a bruise on June 28 and to contradict the testimony of Officers Paxson and Fox that they did not observe a bruise around Vanessa's eye. While the bruise may have looked slightly different on July 1 than it did on June 28, the medical examiner testified that was because Vanessa's death was caused by strangulation, which can cause "pinpoint hemorrhages on the inner surface of the upper and lower eyelids." We do not believe that the prejudicial effect of seeing this single morgue photo outweighs its probative value.

¶ 97    The cases cited by the City are inapposite, as they relate to the need for expert testimony to prove an alternate cause of an injury, which is not at issue here. See *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 59-60 (2000) (finding that the defendant was required to elicit expert testimony to prove whether a past injury was causally related to the present injury suffered by plaintiff); see also *Johnson v. Bailey*, 2012 IL App (3d) 110016, ¶ 21 ("We do not consider the distinction between [plaintiff's] prior back injury and the injury suffered in the accident with [defendant] such that the jury could discern between them without the help of an expert."); *Campbell v. Autenrieb*, 2018 IL App (5th) 170148, ¶ 36 (holding that the trial court abused its discretion when it allowed a nonexpert witness to provide alternative causes of an injury related to a dog bite).

¶ 98    Therefore, we find that the trial court did not abuse its discretion when it admitted the photo, even though we disagree with the court's reasons for admitting the photograph. See *Department of Healthcare & Family Services ex rel. Hodges v. Delaney*, 2021 IL App (1st) 201186, ¶ 28 (we may affirm on any basis appearing in the record whether or not the trial court relied on that basis).

¶ 99    2. The 911 Call Was Relevant and Properly Admitted as Evidence of Damages

¶ 100   The Estate played the audio of Vanessa's 911 call during its opening statement and during Steven's testimony. The City objected, but the trial court admitted the 911 call and instructed the jury to only consider the call to assess survival damages. We review the trial court's admission of the 911 call audio recording for an abuse of discretion. *People v. Smith*, 2017 IL App (1st) 143728, ¶ 67. The 911 call was made at 1:11 a.m. on June 30, 2015. Vanessa was dead by the time she was discovered by officers at 2:33 a.m. that same day. We have listened to the 911 call, and although the audio recording has substantial static and the voices are muffled, Vanessa can be heard to be in distress. The City contends that it was unclear what was occurring during the 911 call, but the Estate argues that the tape was relevant as evidence of the nature of the pain and suffering Vanessa experienced at or near the time of her death. Vanessa can be heard screaming and struggling to communicate with the 911 operator. We find the recording relevant because the jury could reasonably infer from the audio recording that Vanessa was experiencing conscious pain and suffering at the time she placed the 911 call.

¶ 101   The City argues that, even if relevant, the 911 call should be excluded because its prejudicial effect substantially outweighs its probative value. We disagree. Although Vanessa can be heard screaming on the 911 call, it also contains Vanessa's attempts to communicate with the 911 operator. The recording reveals that the operator was unable to obtain enough information to dispatch an officer to Vanessa's location.

¶ 102   The City relies on *Smith*, 2017 IL App (1st) 143728, ¶ 65, where the trial court admitted a 5½ minute 911 call that included significant information about the injuries sustained and the panicked response from the callers. The court held that the 911 call was only introduced to "inflame the passion of the jury" because the evidence was cumulative. *Id.* ¶ 68. Here, by contrast,

the 911 call was introduced to prove damages and was the only piece of evidence that directly contextualized to the jury what happened to Vanessa on June 30, 2015. We are unpersuaded by the City's contention that, because the medical examiner testified that Vanessa experienced conscious pain, the 911 call was cumulative evidence and was unnecessary. While the opinion of the medical examiner supports a finding that Vanessa experienced conscious pain before her death, the 911 call provides direct evidence of Vanessa's pain and suffering. Accordingly, we find that the circuit court did not abuse its discretion when it decided to admit the 911 call. The recording is probative of Vanessa's pain and suffering, and the jury was clearly instructed that it must consider the 911 call audio for damages and not liability. We presume jurors follow jury instructions. *People v. Tapley*, 2020 IL App (2d) 190137, ¶ 81.

¶ 103   3. Lawrence's Statement About Vanessa's Black Eye Was Impermissible Hearsay,

But Its Admission Was Harmless

¶ 104   The City objected to Lawrence's testimony that he told officers that Vanessa told him that Thomas struck her in the eye on June 26, 2015, and that this caused her black eye. The trial court originally overruled the City's hearsay objection but later acknowledged that Lawrence's statement was hearsay. It then instructed the jury not to consider the statement substantively but only to weigh Lawrence's credibility.

¶ 105   We review evidentiary rulings on hearsay testimony and any exceptions to hearsay under an abuse of discretion standard. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). We find an abuse of discretion only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 106   Hearsay is a "statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct.

35

15, 2015). A statement that is offered for a purpose other than to prove the truth of the matter asserted is not hearsay. *People v. Peoples*, 377 Ill. App. 3d 978, 983 (2007). Rule 803 enumerates certain exceptions to the rule against hearsay, none of which are at issue here (see Ill. R. Evid. 803 (eff. Mar. 24, 2022)).

¶ 107 Lawrence's statement to officers was an out-of-court statement that was offered to prove that the officers were aware that Thomas had struck Vanessa. Because Lawrence's statement to officers contains Vanessa's statement to him, there are two levels of hearsay at issue here, both of which must be admissible for Lawrence's statements to have been properly admitted. *Kress Corp. v. Industrial Comm'n*, 190 Ill. App. 3d 72, 78 (1989) (hearsay within hearsay is only admissible if each of the two or more statements falls within an exception). The Estate argues that Lawrence's statement is not hearsay because Vanessa's statement to him "placed Lawrence's statements to police into context" and Lawrence's statements were offered "to prove that at least one police officer had 'reason to believe' Vanessa was abused." However, for the Estate's argument to succeed, Vanessa's statement to Lawrence would need to have been offered for its truth, making the statement inadmissible hearsay. Because the Estate failed to show that Lawrence's statement was not offered for its truth and fails to invoke any exception under Rule 803, Lawrence's statement, which contained two levels of hearsay, was inadmissible hearsay, just as the trial court ultimately acknowledged.

¶ 108 Next, we determine whether the admission of this hearsay evidence was harmless. After the trial court acknowledged that Lawrence's statements were hearsay, it gave the following limiting instruction:

"So there was some testimony by witnesses regarding an alleged domestic violence incident between James Thomas and Vanessa Taylor before June 28, 2015. Now, that

evidence is not substantive evidence. It is merely to be considered by you as to the weight to be given to that witness' testimony."

Because hearsay testimony is, by definition, substantive evidence offered to prove the truth of the matter asserted, the court's limiting instruction did nothing to cure the error.

¶ 109   Nevertheless, we find the admission of this hearsay evidence was harmless because there was more than ample evidence to support the jury's finding that officers had reason to believe Vanessa was an abused person under the Act. Undisputed evidence showed that police officers were aware that Thomas confined Vanessa and Lawrence in the apartment for at least 5 minutes while brandishing a sword and knife and that he would not let them leave. In addition, Lawrence, Dr. Kysia, and other medical staff testified that they observed a bruise underneath Vanessa's eye. This, coupled with the photo of Vanessa taken at the morgue, permitted the jury to infer that the officers saw Vanessa's black eye and, therefore, had reason to believe she was an abused person. Although the trial court erred in admitting the hearsay evidence, ample evidence existed, independent of the improperly admitted hearsay, for the jury to reasonably reach the same result.

¶ 110        4. The Verdict Is Not Against the Manifest Weight of the Evidence

¶ 111   The City contends that the jury's verdict is against the manifest weight of the evidence for the same reasons it is entitled to JNOV. It argues that the police fulfilled their duty to Vanessa by taking Thomas to the hospital, that the officers' acts or omissions were not willful or wanton, and that any acts or omissions by the officers were not the proximate cause of Vanessa's death. On a motion for a new trial, the trial court weighs the evidence and orders a new trial if the verdict is contrary to the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 454. A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based upon any of the evidence. *Lawlor v.*

37

*North American Corp. of Illinois*, 2012 IL 112530, ¶ 38. This court reviews a trial court's ruling denying a motion for a new trial for an abuse of discretion. *Id.* For all of the reasons previously stated, we find that the jury's verdict was sufficiently supported by the evidence and, therefore, the trial court properly exercised its discretion when it denied the City's motion for new trial.

¶ 112                                    III. CONCLUSION

¶ 113   The judgment of the trial court is affirmed.

¶ 114   Affirmed.

---

***Taylor v. City of Chicago*, 2024 IL App (1st) 221232**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-L-03145; the Hon. Israel A. Desierto, Judge, presiding. |
| **Attorneys for Appellant:** | Mary B. Richardson-Lowry, Corporation Counsel, of Chicago (Ruth F. Masters, Myriam Zreczny Kasper, and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), for appellant. |
| **Attorneys for Appellee:** | Richard Dvorak and Adrian Bleifuss Prados, of Dvorak Law Offices, LLC, of Clarendon Hills, for appellee. |
| | Alexandra L. Reed, Miriam Hallbauer, Susan Theiss, and Teresa Sullivan, of Legal Aid Chicago, Danielle Parisi Ruffato, of Ascend Justice, Elizabeth Payne, of Chicago Alliance Against Sexual Exploitation, Elizabeth Monkus, of Chicago Appleseed Center for Fair Courts, Loren Gutierrez and Miguel C. Keberlein, of Legal aid Society of Metropolitan Family Services, Amy Fox, of Life Span, Linda Xóchitl Tortolero, of Mujeres Latinas en Accion, Jaclyn Zarack Koriath, of The Network: Advocating Against Domestic Violence, and Sarah Layden, of Resilience, all of Chicago, Christine Raffaele, of Illinois Coalition Against Domestic Violence, of Springfield, Susan M. Simone, of Land of Lincoln Legal Aid, of East St. Louis, and Kathryn Liss and Kathryn Bettcher, of Prairie State Legal Services, Inc., of West Chicago, for *amici curiae* Legal Aid Chicago *et al.* |