2024 IL App (1st) 220767-U

No. 1-22-0767

Order filed June 28, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 19 CR 5721 |
| PEDRO MORALES, | ) ) | Honorable Joseph M. Cataldo, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Mitchell and Justice Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions are affirmed where trial counsel was not ineffective, and the trial court did not rely upon impermissible evidence in its findings.

¶ 2    Following a bench trial, defendant Pedro Morales was found guilty of five counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)) and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1) (West 2018)) and sentenced to an aggregate term of 34 years' imprisonment. On appeal, Mr. Morales contends that trial counsel was

ineffective for failing to object to hearsay, and the trial court based its guilty finding on speculation and matters outside the record. For the following reasons, we affirm.

¶ 3                                                    BACKGROUND

¶ 4      Mr. Morales was charged by indictment with three counts of aggravated kidnapping, eight counts of predatory criminal sexual assault of a child, and four counts of aggravated criminal sexual abuse arising from a series of incidents related to A.M., who was under 13 years old.

¶ 5      Prior to trial, the State moved, pursuant to section 115-10 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-10 (West 2022)), to introduce statements made by A.M. to Wendy M., her mother, and to Guadalupe Salgado, a Children's Advocacy Center (CAC) interviewer, in March and April 2019. At the hearing, Wendy M. testified that Mr. Morales was her partner, and in March 2019, he lived with her, their two sons, and A.M., his stepdaughter, who was 12 years old. On March 30, 2019, Wendy M. left the house to go to the bank but returned after "four or five minutes" because she forgot the bank card. She discovered Mr. Morales and A.M. in the bathroom, which was locked. She unlocked the door with her vehicle keys and saw that A.M. was nude and sitting in the bathtub with the water running.

¶ 6      Wendy M. asked A.M. whether Mr. Morales "was doing something to her." A.M. was "scared" and initially did not answer, but eventually stated that he was "touching" her "intimate parts," specifically, her vagina, with his fingers. A.M. stated that it had been happening since she was six years old. The next day, Wendy M. went to the police.

¶ 7      On cross-examination, Wendy M. stated that she lived with Mr. Morales for approximately 11 years. He disciplined A.M. by taking away her phone during her "rebellious stage" when she started middle school. When Wendy M. discovered Mr. Morales in the bathroom with A.M., he

was clothed and the shower curtain "was pulled *** three-fourths." Defense counsel asked whether Wendy M. "persisted" in questioning A.M. about what Mr. Morales was doing, and Wendy M. stated that A.M. "said what she had to say."

¶ 8    Ms. Salgado testified that she interviewed A.M. on April 1, 2019, at the CAC in Hoffman Estates. She previously interviewed A.M. on October 15, 2018, regarding a different allegation. On that occasion, she informed A.M. about the "rules," including "being honest and truthful" during the interview, which A.M. indicated she understood. During the April 2019 interview, A.M. disclosed to Ms. Salgado that Mr. Morales touched her inappropriately. During the hour-long conversation, Ms. Salgado believed that A.M. had age-appropriate knowledge of the facts and terminology. The interview was recorded.

¶ 9    The State published a portion of the interview. In the interview, A.M. informed Ms. Salgado that Mr. Morales had been touching her since she was six or seven years old. She described incidents where he kissed her, touched her chest or vagina, licked her vagina, placed his fingers inside it, and moved his fingers in and out, which hurt. She stated that he performed these acts "in bed," and when Wendy M. left the house. She described other incidents where he inserted his penis into her mouth, which happened when Wendy M. showered. A.M. told Salgado that he placed his "dick" in her "butt," and attempted to place it inside her vagina. She also saw "sperm" come out of his penis occasionally, which he referred to as "milk." She stated that he occasionally took pictures and videos of her on his phone, which he would keep "for a while" before erasing; she also sent him a few videos upon his request. He occasionally asked A.M. what she would say if asked whether someone touched her, and she told him she would say no.

¶ 10     A.M then described how Wendy M. "found out," about the charged incident. . Mr. Morales was going to shave her legs, which he did occasionally. He directed her to lay down in the shower with the water flowing onto her vagina and he touched her. He opened the curtain so that he could see her. Wendy M. entered the bathroom at this point, and A.M. moved back, because she was afraid of her mother's reaction. Wendy M. asked A.M. if Mr. Morales touched her, which made A.M. nervous, and she started to "tear up." Mr. Morales denied it, and said he was in the bathroom because she used too much hot water. He insisted to A.M. that she "tell the truth." A.M. agreed, but she later told Wendy M. what he had been doing to her, and Wendy M. took her to the police station.

¶ 11     On cross-examination, Ms. Salgado stated that she did not recall whether A.M. told her about Mr. Morales disciplining her. She agreed that she spoke with A.M. about "bias issues," but stated that during interviews she does not want to know whether a child is angry at a particular person. She did not speak with Wendy M. regarding A.M.'s emotional well-being between the two interviews.

¶ 12     The trial court found the totality of the circumstances surrounding A.M.'s statements showed "sufficient safeguards of reliability." The court also found that she had age-appropriate knowledge of sexual acts and terminology, leading the court to believe her statement was not rehearsed. The court granted the State's motion and allowed Ms. Salgado and Wendy M.'s testimonies.

¶ 13     The State proceeded on two counts of aggravated kidnapping, six counts of predatory criminal sexual assault of a child, and three counts of aggravated criminal sexual abuse. The aggravated kidnapping counts and one predatory criminal sexual assault count were premised upon

an incident on March 30, 2019, where Mr. Morales allegedly committed an act of sexual conduct between his hand and A.M.'s sex organ. The other five predatory criminal sexual assault charges were premised upon conduct occurring between May 21, 2012, and March 29, 2019, involving contact between Mr. Morales' penis and A.M.'s sex organ and anus, Mr. Morales' mouth and A.M.'s sex organ, Mr. Morales' penis and A.M.'s mouth, and Mr. Morales' hand and A.M.'s sex organ. The aggravated criminal sexual abuse counts were premised upon incidents occurring on March 30, 2019, and between May 21, 2012, through March 29, 2019, involving conduct between Mr. Morales' hand and A.M.'s breast, and an incident occurring on May 21, 2012, through March 29, 2019, involving conduct where Mr. Morales ejaculated on A.M.'s body.

¶ 14    At trial, A.M. testified that she was 15 years old at the time of trial and lived with Wendy M. and two brothers. A.M. did not have a good relationship with Wendy M. and used to have a "very good" relationship with Mr. Morales, who was "like a dad" to her.

¶ 15    When A.M. was six years old, Mr. Morales touched her breasts with his hands for 30 to 45 seconds. Next, when A.M. was approximately seven years old, he put his hand in A.M.'s pants under her underwear and rubbed the outside of her vagina with two or three fingers in three separate incidents. During the last incident, he attempted to put his pointer finger inside her vagina, but it hurt A.M. and so he stopped.

¶ 16    One or two years later, A.M. was watching television in Mr. Morales' room when he entered, placed a blue shirt over her eyes, and removed her pants and underwear. He then placed his pointer finger inside her vagina and moved it "back and forth." A.M. testified that it burned because he had eaten hot wings and did not wash his hands. After hearing a "car noise," he removed his finger quickly, and then comforted A.M. who had begun to cry.

¶ 17    Approximately a year later, Wendy M. was in her bedroom watching television with the door "almost" closed. Mr. Morales removed A.M. from her bedroom and took her to the hallway. He told her to get on her knees and suck his penis, which she did for approximately five minutes. A few months later, A.M. was in Mr. Morales' room watching television when he entered, removed A.M.'s clothes, and "took his penis out and started rubbing on himself." He touched A.M.'s breasts and vagina with his other hand, and, after ten minutes, A.M. saw "sperm" come out of his penis.

¶ 18    When A.M. was 11 years old, she and Mr. Morales watched a movie together in his bedroom. He removed A.M.'s shorts and underwear, rolled her onto her stomach, and placed his penis into her anus, moving it back and forth. A.M.'s cousin and brother opened the door, and Mr. Morales got off A.M. quickly and left the room to speak with them. A few months later, Mr. Morales placed his penis into A.M.'s anus again while she sat on top of him, and he moved her hips up and down.

¶ 19    When A.M. was 12 years old, Mr. Morales rubbed A.M.'s vagina with his pointer and middle fingers and attempted to place his penis inside her vagina. He told A.M. that it would not hurt if she "wait[ed] a little longer." A.M. did not tell anyone about this incident because another incident happened with one of A.M.'s uncles. A.M. was "bull[ied]" by family members who believed she lied. Wendy M. did not discuss the uncle incident with A.M. or console her, and A.M. believed that Wendy M. did not believe her. A few months later, Mr. Morales placed her on the side of his bed, removed her clothes, and placed his face between her legs and licked and sucked her vagina. A.M. described other incidents, including one where Mr. Morales ejaculated on her stomach, and she was "nervous" because she did not want to become pregnant.

¶ 20　A.M. then described the incident on March 30, 2019, when she was in the shower. Mr. Morales locked the door when he entered the bathroom, but a person could open the locking mechanism from the outside. He opened the shower curtain, touched A.M.'s breasts, and told her to open her legs and move her vagina under the running bathroom faucet with her feet on the wall. He touched her vagina, groped her chest, and kissed her neck. He stopped touching her when Wendy M. entered the bathroom. Later, Mr. Morales entered A.M.'s room and told her to tell Wendy M. that A.M. had not told the truth.

¶ 21　On cross-examination, A.M. agreed that she was "fuzzy" on the details of the early incidents with Mr. Morales and did not have a clear memory of each incident. Mr. Morales occasionally took A.M.'s phone from her, but she did not remember why and stated that it did not make her angry. A.M. denied being "yelled at" for using too much hot water and "getting caught" watching pornography on her laptop or iPad. A.M. agreed that occasionally she lied to Wendy M. and Mr. Morales. Although A.M. spoke with a social worker and police officers about an incident where an uncle inappropriately touched her, she did not tell anyone about incidents with Mr. Morales. During the incidents with Mr. Morales, Wendy M. was either running errands or in the shower. A.M. denied that Mr. Morales was "upset" with her for using too much hot water in the shower on March 30, 2019.

¶ 22　On redirect examination, A.M. testified that although she was "fuzzy" regarding some details, she remembered the sexual acts. A.M. testified that she lied to her "parents" occasionally, regarding her grades or "school stuff," but never lied about people inappropriately touching her.

¶ 23    Wendy M. testified that Mr. Morales was her partner for 11 or 12 years, and that he was the father of her two sons. Wendy M. described her relationship with A.M. as "mother and daughter but not close." A.M. occasionally lied to Wendy M. but not about serious issues.

¶ 24    At approximately 8 p.m. on March 30, 2019, Wendy M. left the house to deposit money in the bank, which she did every weekend. Wendy M. most often ran errands during school hours, but sometimes did so when A.M. was home. Wendy M. rarely left the house after Mr. Morales returned home at night but did so on March 30, 2019. On cross-examination, Wendy M. agreed that A.M. "act[ed] out" often and needed to be disciplined, which Mr. Morales did by taking away her phone or another privilege. Wendy M. did not know of an incident where Mr. Morales disciplined A.M. for watching pornography. A.M. often took long showers and depleted the hot water, which was "always a battle with her."

¶ 25    The State entered stipulations that Wendy M. and Ms. Salgado would testify consistently with their prior testimonies during the pretrial hearing, and the court entered the transcripts into evidence. Defense counsel did not object and adopted his cross-examination from Wendy M.'s testimony. The State sought to enter into evidence the video of A.M.'s forensic interview. The court asked defense counsel if he objected, and he responded, "such that it is with regard to the 115-10 arguments," but had no other objection. The State published the video in its entirety, excluding portions where Ms. Salgado exited the room. Defense counsel did not object.

¶ 26    The trial court granted defense counsel's motion for a directed verdict with respect to the two aggravated kidnapping counts.

¶ 27    Defense counsel introduced several stipulations. First, the parties stipulated that the Illinois State Police Division of Forensic Services examined A.M. on April 2, 2019, found no lacerations,

bleeding, or bruising on her vagina or anus, and obtained "vaginal vault swabs." The parties next stipulated that the DNA taken from the vaginal vault "did not end up showing any male DNA." Lastly, the parties stipulated that defendant's phone was examined, and "no relevant photographs" were discovered.

¶ 28     During his direct examination, Mr. Morales denied all allegations of sexual conduct with A.M. He testified that on March 30, 2019, he worked approximately 13 hours and received a paycheck. Wendy M. went to the bank, which was "about three minutes" from their house, to deposit the check when Mr. Morales was almost done eating. After dinner, he wanted to shower in the master bathroom, but A.M. was in the other shower and had depleted the hot water. He knocked on the other bathroom door and told A.M. to "hurry" because she was using all the hot water, but A.M. did not respond. He opened the door and shower curtain after A.M. did not respond; she responded "[t]hat's fine" but did not leave the bathtub. Mr. Morales denied making physical contact with A.M. After the incident, he voluntarily went to the police with the family.

¶ 29     Mr. Morales disciplined A.M. occasionally by taking away her phone, tablet, and television, and subsequently A.M. became "very upset" and did not speak to him or Wendy M. Mr. Morales saw pornographic webpages in the history of A.M.'s tablet approximately three weeks before the March 30, 2019, incident, and he disciplined her. A.M. also had a history of lying to him and Wendy M. It was "normal" for Wendy M. to be gone when Mr. Morales was with A.M., but he agreed that did not occur "often."

¶ 30     When A.M. was approximately 10 years old, she told Mr. Morales that a relative "touched her" once. He told Wendy M., went to the police station, and ensured A.M. worked with a social worker.

¶ 31    Mr. Morales stated that he would have been unable to make A.M. suck his penis in the hallway because the apartment they lived in during the time was only 900 square feet with two bedrooms.

¶ 32    On cross-examination, Mr. Morales stated that he was the sole income provider for the family between 2012 and 2019, and Wendy M. was "always" home. He agreed that it was "normal" for him to be alone with A.M. because "a father stays with their kids." He and A.M. had a close relationship where A.M. would tell him secrets. He denied locking the bathroom door on March 30, 2019, and stated that he held the door closed so that the "small boy" would not enter. He stated that he did not open the curtain because it was "six feet away" from the door, and he was only in the bathroom for "30 seconds." He stated that he had never before entered the bathroom when A.M. was showering.

¶ 33    The trial court found Mr. Morales guilty of five counts of predatory criminal sexual assault of a child and two counts of aggravated criminal sexual abuse for incidents involving contact between Mr. Morales' hand and A.M.'s vagina, his penis and A.M's vagina, anus, and mouth, his mouth and A.M's vagina, and conduct where he touched A.M's breasts with his hand and ejaculated on her body. The court found Mr. Morales guilty of two counts of aggravated criminal sexual abuse, noting A.M.'s testimony regarding Mr. Morales' hand-to-breast contact and the incident where he ejaculated on A.M.'s stomach was vague and not detailed. The court found Mr. Morales not guilty of one count of predatory criminal sexual assault premised on hand to vagina contact, noting that although numerous accounts existed regarding contact between Mr. Morales' hand and A.M.'s vagina, it would only find him guilty of one count.

¶ 34    The trial court commented that A.M. testified "very honestly and very credibly" and showed no motive to lie. The court noted that A.M. detailed many sexual acts and her feelings regarding them. A.M. did not "just" assert that Mr. Morales "put his penis in her vagina," but described multiple acts which did not seem to be invented. The court stated that Mr. Morales groomed A.M. and coached her about what to say if anyone asked what happened to her. It noted that A.M. had a "bad experience in the past" where Wendy M. did not believe her allegations.

¶ 35    The court commented that it did not believe that Wendy M. went to the bank and back in six minutes. It "watched" her in court, noted that "[i]t took her almost three minutes or four minutes to get from the door of the courtroom to the witness stand," and doubted that "she was banking in that quick of time."

¶ 36    The trial court found the fact that no DNA was recovered from A.M.'s body on March 30 unpersuasive, as the only event that day was Mr. Morales touching A.M.'s vagina under running water in a bathtub, and A.M. testified she remained in the bathtub for some time after.[1] It found "[o]ne would not expect DNA or any tears or bruising of any kind in that particular event." The court also stated, "[a]s we know, the vagina and anus heal very quickly. So any prior incident once before would not be affected by that in the VSI."

¶ 37    The trial court stated that Mr. Morales had a habit of erasing explicit photographs, so it was believable that he would not have photographs or videos on his phone. The court concluded that A.M.'s testimony that Mr. Morales was going to shave her legs seemed to be "a pretty elaborate story to make up if they're mad about someone taking away their phone."

---

[1] Although the court noted that no DNA was recovered from A.M.'s body on March 30, 2019, the stipulation established that the vaginal vault swab was conducted on April 2, 2019.

¶ 38    Mr. Morales filed a motion for a new trial, arguing in relevant part that the trial court erred in denying his motion to exclude "the 115-10 statements," that the State failed to prove him guilty beyond a reasonable doubt, and that he was denied due process. Following a hearing, the court denied his motion, noting that it stood by its ruling after the 115-10 hearing. The court also commented that it observed A.M.'s demeanor while testifying and found her honest and credible, and that she testified to "a number of acts of sexual abuse" and remembered details which did not seem invented. The court noted that Wendy M. corroborated A.M.'s testimony that on March 30, 2019, the bathroom door was locked, and that Wendy M. stated that she unlocked it and saw Mr. Morales with A.M., who was naked in the tub.

¶ 39    After a sentencing hearing, the trial court imposed an aggregate sentence of 34 years' imprisonment. The court also corrected its guilty findings, explaining that it misspoke, and that Mr. Morales was guilty of only one count of aggravated criminal sexual abuse, premised upon conduct where he touched A.M.'s breasts. The court stated that it found Mr. Morales not guilty of aggravated criminal sexual abuse for another incident where he touched A.M.'s breasts, and the incident where he ejaculated on A.M.'s stomach, because the testimony was vague. The court denied Mr. Morales' subsequent motion to dismiss the aggravated criminal sexual abuse count.

¶ 40                                   ANALYSIS

¶ 41    We note that we have jurisdiction to consider this matter, as Mr. Morales filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017); see also *People v. English*, 2023 IL 128077, ¶ 25.

¶ 42    On appeal, Mr. Morales argues that trial counsel was ineffective for failing to object to the admission of certain statements in A.M.'s videotaped interview. Specifically, he claims A.M.'s

statements regarding him taking pictures and videos of her on his phone, which he later erased, were inadmissible hearsay and impermissible under section 115-10(a)(2) of the Code. He claims that the trial court used these unreliable statements in its ruling to explain why a forensic analysis of his cellphone revealed no photographs or videos.

¶ 43    To prevail on a claim of ineffective assistance of counsel, "a defendant must show both that counsel's performance was deficient, and that the deficient performance prejudiced the defendant." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); see *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish deficient performance, a defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219 (2004) (citing *Strickland*, 466 U.S. at 687). "Effective assistance of counsel refers to competent, not perfect representation." *Evans*, 209 Ill. 2d at 219 (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984)).

¶ 44    To establish prejudice, the defendant must show with "reasonable probability" that but for counsel's errors, the result of the proceeding would have been different. *Id.* at 220. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." (Internal quotations marks omitted.) *Id.* "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35. Our review is *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 45    We look at the totality of the evidence in weighing the impact of counsel's alleged errors, and "must look to the ramifications the improper evidence might have had on the factfinder's overall picture of events." *People v. McCarter*, 385 Ill. App. 3d 919, 935-36 (2008). Decisions regarding when to object are matters of trial strategy, which will "typically not support a claim of

ineffective representation." *People v. Macias*, 2015 IL App (1st) 132039, ¶ 82. In order to establish ineffective assistance, the defendant must overcome the presumption that counsel's conduct "might be considered sound trial strategy under the circumstances." *Id.*

¶ 46 Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); *Taylor v. City of Chicago*, 2024 IL App (1st) 221232, ¶ 106. Under section 115-10 of the Code, in a prosecution for a physical or sexual act perpetrated against a child under the age of 13, testimony of an out-of-court statement made by the victim "describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense" being prosecuted shall be admitted as an exception to the hearsay rule subject to the requirements of section 115-10. 725 ILCS 5/115-10(a)(2), (b) (West 2020). A videotaped statement by a child victim describing a matter pertaining to any sexual act charged is admissible under section 115-10 of the Code. See *People v. Bowen*, 183 Ill. 2d 103, 110-22 (1998).

¶ 47 Mr. Morales does not challenge the admissibility of the majority of the video, nor the pretrial proceedings held pursuant to section 115-10. Rather, he contends that counsel was ineffective for not objecting to the portions of the videotaped statement where A.M. told Ms. Salgado that he took pictures and videos of A.M. on his phone or asked her to send him pictures and videos and later deleted them, including the alleged incident where he recorded her in the shower on March 30, 2019. Mr. Morales claims that the trial court considered these statements, to which A.M. did not testify at trial, in its ruling to explain why explicit photographs were not discovered on his phone.

¶ 48 Even assuming Mr. Morales could rebut the presumption that trial counsel's decision not to object to the evidence was sound trial strategy, he has failed to establish prejudice because the evidence of his guilt was overwhelming. See *People v. Gilbert*, 2013 IL App (1st) 103055, ¶ 32. At trial, A.M. testified to many detailed sexual acts that Mr. Morales committed against her since she was approximately six years old, including an incident where he touched her vagina while she was in the shower on March 30, 2019. At the pretrial hearing, Wendy M. testified that she discovered him in the locked bathroom with A.M., who was naked in the shower. The court found A.M. to be credible and showed no motive to lie. Nothing in the record demonstrates that the court considered A.M.'s statements that Mr. Morales took and deleted explicit photographs and videos of A.M. as anything other than context for the charged sexual acts. Given this record, it is unlikely that he could show a reasonable probability that the outcome would have been different absent counsel's failure to object to this evidence.

¶ 49 Mr. Morales also argues that he was denied due process where the trial court considered matters outside the record and based its finding of guilt upon speculation. Specifically, he contends that the court's conclusion that it did not expect DNA to be found during A.M.'s medical examination and its comment that the "vagina and anus heal very quickly" were not based on the evidence at trial. Additionally, he argues that the trial court erroneously concluded that the time Wendy M. traveled to the bank on March 30, 2019, was longer than the evidence in the record suggested, due to its observation of her in court years later.

¶ 50 In addressing this argument, Mr. Morales asserts that trial counsel preserved the issue for review because his motion for a new trial generally asserted that he was denied due process. This assertion is incorrect. "Ordinarily, a defendant must both specifically object at trial and raise the

specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). The general due process claim in the motion for a new trial was insufficient to preserve the issue. See *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 50 ("A defendant must both specifically object at trial and raise the *specific* issue again in a posttrial motion to preserve an alleged error for review.") (emphasis in original) (internal quotation marks omitted). Mr. Morales alternatively contends that we may review the issue under either prong of the plain error doctrine or as ineffective assistance of counsel.

¶ 51    Under the plain error doctrine, a court may consider an unpreserved issue where a clear or obvious error occurs and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Regardless of "[w]hether we consider the issue on the merits or through the lens of plain error analysis, the first step is to determine whether error occurred." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 89. Under both prongs of the plain error analysis, the defendant bears the burden of persuading the court to excuse his forfeiture under both prongs of the plain error analysis. *People v. Jackson*, 2022 IL 127256, ¶ 19.

¶ 52    "In a bench trial, a judge's determination based on his or her own private knowledge, that is untested by cross-examination or the rules of evidence, constitutes a denial of due process." *Id*. Although a trial judge may consider his or her own life experience in ruling, in a bench trial the court "is limited to the record developed during the course of the trial." *People v. Petrov*, 2023 IL

App (1st) 160498, ¶ 54. We review whether defendant was denied due process by the court's reliance on information outside the record *de novo*. *Id.*

¶ 53    Here, the trial court's comments that it did not expect DNA to be found during A.M.'s medical examination and that the "vagina and anus heal very quickly" were based on information outside the record. We therefore find that an error occurred. However, neither prong of the plain error analysis provides relief for Mr. Morales.

¶ 54    As noted above in addressing the lack of prejudice regarding trial counsel's purported ineffectiveness, the evidence was not closely balanced. In making this determination, a reviewing court must "review the entire record and conduct a qualitative, commonsense assessment of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses' credibility." *People v. Williams*, 2022 IL 126918, ¶ 58 (internal quotation marks omitted). Where the sole evidence presented at trial consists of the equally "credible" testimonies of the State's witnesses and the defendant, a "contest of credibility" exists, and the evidence is closely balanced for first prong plain error review. *People v. Naylor*, 229 Ill. 2d 584, 606-611 (2008). However, we will not find the evidence closely balanced where other evidence exists which corroborates or contradicts either version, or the defendant's version of events is not credible. See *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90.

¶ 55    The record established that the trial court believed A.M.'s testimony was credible, wherein she described many detailed sexual acts performed by Mr. Morales. Wendy M. testified that on March 30, 2019, she discovered Mr. Morales in the locked bathroom with A.M., who was naked in the shower, corroborating portions of A.M.'s account of that incident. The court rejected Mr. Morales' argument that A.M. invented the allegations regarding the March 30, 2019, incident

because she was angry about him disciplining her, finding it was "a pretty elaborate story to make up if they're mad about someone taking away their phone."

¶ 56    Mr. Morales testified that on March 30, 2019, he entered the bathroom while A.M. was showering because she depleted the hot water. He testified that he held the door closed so that the "small boy" would not enter the bathroom. However, Wendy M. testified that the bathroom door was "locked", and she opened the door using her vehicle keys. Thus, Wendy M.'s testimony corroborates A.M.'s version of events. The trial court also noted that A.M.'s detailed descriptions of the incidents established her credibility and noted that she described "a pretty elaborate story" to invent because she was allegedly angry at Mr. Morales. We are, thus, not faced with equally credible accounts without corroboration, and so no contest of credibility exists. See *Naylor*, 229 Ill. 2d at 606-11. Accordingly, the evidence is not closely balanced, and first prong plain error is not satisfied. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 57    Next, the error was not so serious that it affected the fairness of Mr. Morales' trial and challenged the integrity of the judicial process. See *id*. Second prong plain errors, like structural errors, "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010). The error must "affect the framework within which the trial proceeds, rather than simply an error in the trial process itself." *People v. Johnson*, 2017 IL App (2d) 141241, ¶ 51.

¶ 58    Here, the error is merely the court's consideration of its personal knowledge regarding DNA evidence and the healing capacity of the vagina and anus, which does not rise to the level of second prong structural error. See *People v. Bever*, 2019 IL App (3d) 170681, ¶¶ 33, 45-47 (trial judge's consideration of his son's experiences to assess the credibility of the witnesses does not

rise to the level of structural error). Mr. Morales has not met his burden to establish that the court's reference to information outside the record affected the fairness of his trial and challenged the integrity of the judicial process. See *Jackson*, 2022 IL 127256, ¶ 19. Thus, his argument that we may reach his claim by second prong plain error fails.

¶ 59    Additionally, the court's comment that it did not believe that Wendy M. went to and from the bank in six minutes based on its observations of her in court was a function of its role as the fact finder. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("[I]n a bench trial, it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence.").

¶ 60    Nevertheless, even if the trial court erred in making that determination, the record does not establish that the court relied upon this comment, especially as the crucial aspect of Wendy M.'s testimony established that she discovered Mr. Morales in a locked bathroom when A.M. was showering. As noted, the court primarily relied on A.M.'s detailed descriptions of the events, including her relationship with Wendy M. and Mr. Morales, which the court found credible. How long it took Wendy M. to leave and return to the home was irrelevant to what she witnessed in the bathroom. Given this record, no prejudice resulted from the trial court's statement regarding its observations of Wendy M. See *Petrov*, 2023 IL App (1st) 160498, ¶ 55.

¶ 61    In sum, we find no plain error resulting from the trial court's reliance on knowledge outside of the record. As there is no plain error, counsel was not ineffective for failing to preserve the issue in a posttrial motion. See *People v. Johnson*, 218 Ill. 2d 125, 143-44 (2005).

¶ 62                                    CONCLUSION

¶ 63    Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 64    Affirmed.