NOTICE
Decision filed 04/28/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 241123-U

NO. 5-24-1123

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| KORD CAIN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 20-F-2 |
| | ) | |
| CASANDRA FOSTER, | ) | Honorable |
| | ) | Jeffrey A. DeLong, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the trial court's denial of the emergency petition to suspend parenting time and finding of indirect civil contempt.

¶ 2    Kord Cain's emergency petition to suspend Casandra Foster's parenting time was denied. Kord was also found in indirect civil contempt for failure to abide by the parenting plan. Kord appeals both findings. For the following reasons, we affirm.[1]

¶ 3                                    I. Background

¶ 4    On August 13, 2020, an agreed parenting plan was entered regarding R.L.C., born in 2017, and A.L.C., born in 2018, awarding Kord a majority of the parenting time subject to Casandra's

_____

[1]Due to the length of the record and complexity of issues before this court, we find good cause for the delay in the filing of this decision. Ill. S. Ct. R. 311(a) (eff. July 1, 2018).

1

parenting time every other Sunday to Monday and every other Sunday to Tuesday. Between then and March 2024, when the issues that brought about this appeal were raised, the parties filed no less than 22 petitions regarding the children.

¶ 5   On March 18, 2024, Kord filed a *pro se* emergency petition to temporarily suspend Casandra's parenting time. He alleged that Casandra and her boyfriend, John Glynn, had abused the children. Attached to the petition was Kord's unsigned and unattested affidavit regarding conversations he had with the children about alleged abuse by Casandra and Glynn, wherein they told him that on March 10, 2024, Casandra and Glynn yelled at them, resulting in a physical altercation between Glynn and R.L.C. Kord also discussed conversations he had with a social worker, a police officer, and his mother regarding the children's allegations.

¶ 6   On that same day, Casandra filed a petition for a rule to show cause, alleging Kord did not provide her with her scheduled parenting time from March 16, 2024, to March 19, 2024.

¶ 7   Both matters were called for hearing on March 21, 2024. After hearing evidence, the trial court denied the emergency petition and reserved ruling on the show cause petition until April 4, 2024, and ordered four days of make-up parenting time. The parties appeared on April 4, 2024, and according to the docket, the make-up parenting time did not occur. Kord was found in indirect civil contempt and sanctioned to an indeterminate sentence in the Effingham County jail. The mittimus was stayed pending a purge, which required Kord to provide parenting time to Casandra from April 6 to April 9, April 13 to April 17, April 21 to April 24, April 27 to May 1, and May 4 to May 8, in addition to Casandra's regular parenting time. The matter was scheduled for purge review on May 14, 2024. On that date, both parties appeared, and a docket entry indicates that the purge was complete.

¶ 8    In the meantime, on March 28, 2024, Kord subpoenaed Casandra, seeking video footage from several cameras from Casandra's home for March 10, 2024. On May 6, 2024, Kord filed a petition for rule to show cause, alleging that Casandra refused to allow him telephone contact with the children in violation of the parenting plan. Casandra filed a motion to quash the subpoenas. These matters were called for hearing on June 10, 2024. After hearing evidence, the trial court quashed the subpoenas except for the one regarding the kitchen footage, which was to be emailed to Kord within 24 hours. Kord's petition for rule to show cause was denied.

¶ 9    On June 17, 2024, Kord filed a motion to reconsider the denial of his show cause petition, indicating that since receiving a copy of the kitchen footage, he had "new evidence" concerning that motion. On July 5, 2024, Casandra filed a petition for rule to show cause, alleging that she was to have the children over the July 4 holiday, but that Kord took the children to Arkansas instead. The motion to reconsider was called for hearing on August 8, 2024, and denied, and the petition for rule to show cause was continued.

¶ 10    On September 5, 2024, Kord filed an emergency motion requesting that Casandra's parenting time be suspended based on the March 10, 2024, incident. He stated that the video he obtained from the subpoena showed that Glynn abused R.L.C. He further alleged that on the weekend of August 17, 2024, A.L.C. was spanked on his bottom, leaving marks. He claimed that R.L.C. found drug paraphernalia while at Casandra's home, took it to school, and gave it to an officer there. He asserted that the children were in danger while in Casandra's care.

¶ 11    The emergency motion was called for hearing on September 19, 2024. Kord called Casandra first, who admitted that R.L.C. took drug paraphernalia she had obtained from Casandra's home to school.

3

¶ 12    Kord then testified on his own behalf. He admitted that he has been in court many times, making lack of safety allegations on behalf of his children. At the last court hearing, he had asserted that R.L.C. stated that Glynn had choked her, and since that time, he had been able to subpoena a video of the March 10, 2024, incident, which he asked the trial court to view. He discussed that on the weekend of August 17, 2024, during the night, R.L.C. woke up and smelled "stinky stuff." She looked in Casandra's room and saw Casandra and Glynn "smoking out of pipes and taking small white pills." He also stated that A.L.C. returned home from a visit with handprints on his buttocks from being spanked, but Kord did not take any pictures because he did not want to get in trouble. The Department of Children and Family Services conducted an investigation but never took A.L.C. to a medical examiner. Two weeks later, when he was picking up R.L.C. from school, she showed him drug paraphernalia in her backpack, and he told her to go back inside and give it to the officer.

¶ 13    On cross-examination, Kord testified that on March 10, 2024, he had been trying to talk to the children all day, and Casandra would not respond. Finally, by the afternoon, worried that something was wrong, he drove to Casandra's house and saw the children playing outside without adult supervision, so he called the police for a welfare check. After the police left, the incident on the video occurred.

¶ 14    Kord then argued with the trial court, demanding that it interview the children *in camera*. The trial court declined to conduct an *in camera* interview, indicating that Casandra had an absolute right to be present if the children wanted to accuse her of abuse. Kord called R.L.C. to testify. She stated that she felt safe when she was with him but not with Casandra. She testified that on March 10, 2024, Glynn had grabbed a purse from around her neck and pulled it hard, and it hurt. She also testified that she heard and smelled her mother smoking and taking small white pills. The following exchange then occurred:

4

"[KORD:] Has your mom ever hit you?

[R.L.C.:] When I was little a couple of times.

[KORD:] Where did she hit you?

THE COURT: Hold up. When was this?

[KORD:] I've come in here years and years and years.

THE COURT: None of this has been pled. Move on. You can laugh again at me, sir. I'm getting a little bit tired of it. I'm being very patient—

[KORD:] I'm watching my kids get abused—

THE COURT: We are not going back to that. There is nothing pled in this pleading relating to anything but three incidents, correct?

[KORD:] So the fact that she has hit her in the past—

THE COURT: You're not going say that in front of your seven year old daughter again in my courtroom. Do you understand?"

¶ 15    R.L.C. testified that she loves her mother and enjoys spending time with her but does not like spending the night. After arguing with the trial court, Kord rested. Casandra briefly testified on her own behalf, stating:

"I did also want to say Kord has made, I feel, like threats because he says if you don't do something, if the courts don't do something, he'll do something. He has come out to my house multiple times and parked in the road sometimes at night and sometimes during the day. I do find that alarming itself. He has followed me places too. I just want the situation to be done. I've tried talking to Kord as well trying to make the situation better. I just want this better for our children. They don't deserve this. They don't deserve to be put in front of us."

¶ 16    After hearing closing the arguments, the trial court denied the emergency motion, stating in part:

"I understand what you want. I understand you believe that there has been abuse. The Court has viewed Exhibit 1, and it does show her paramour grabbing the straps of the purse. Telling her to take it off. Not using the greatest language and yelling. This is also right after you were leaving because the police were there. And the thing that frustrates the Court the most is you heard why your daughter was most upset. I'm glad you said you talked to her about that. I don't hear her yelling ouch, that hurts. Ouch, that hurts. It's dad's going to be mad at me if I don't have my phone. Dad is going to be mad.

The kids are getting thrown in the middle of this and you know this isn't going to end well for them if they are constantly thrown in the middle of it. ***

I can't find that that is—this is an onerous burden. You're wanting the Court to restrict and find that there has been serious endangerment of the child's physical, mental, [moral], or emotional health. Paramour yelling. I know that's not good, but the fact that the kid is so scared that dad [is] going to be mad because she doesn't have her phone on her

5

right after the police were there because you called them because they were unsupervised in the yard playing.

But the other allegations you have is there was a child spanked. I haven't heard any other evidence regarding that. I haven't heard if it was reasonable discipline. I understand you don't have the way to prove that, but I don't know. Was there a reason for the spanking? All forms of corporal punishment, although frowned upon these days, doesn't mean that that's serious endangerment of the child. It's on the buttocks.

The other issue is the child said mom was smoking. I don't know what mom was smoking. You yourself said you smoke marijuana so both of you smoke marijuana. And then there is white pills. Obviously, I'm glad your seven year old doesn't know what the white pills are. It could have been anything. It could have been Advil. Advil, the unbleached [ones] are aspirin white. The kids didn't have those drugs so it's not like—

I can't find that you have met your burden here today, sir."

¶ 17    The parties were back in court on October 4, 2024, for the show cause order for Kord's failure to provide Casandra with her July 4 parenting time. Kord indicated that he did not feel comfortable proceeding because he had ordered transcripts of previous hearings and wanted to file a motion for substitution of judge. The trial court stated that it would proceed with the hearing since this was the third time it was set. Kord testified on his own behalf. He stated that not providing the July 4 parenting time to Casandra was an honest mistake because he thought he was to have the children over the July 4 holiday. He admitted that he did not check with the parenting plan to make sure. Kord texted Casandra on June 27, 2024, regarding rearranging some scheduling, and Casandra responded, confused, as she thought she was to have the children. Kord had planned a trip to Arkansas with his mother, and the children had already been told about it. He repeatedly testified it "was a genuine mistake" and that he had offered several make-up dates. He indicated that it boiled down to either canceling the trip and disappointing his children or disappointing Casandra. He chose the latter because he did not want to disappoint his children.

¶ 18    Casandra testified on her own behalf. She indicated that this was not a one-time occurrence. Rather, there have been many times when Kord has refused to provide her with her scheduled

6

parenting time. She testified about having to come to court on previous occasions because he had been withholding parenting time.

¶ 19    The trial court found Kord in indirect civil contempt, stating in part:

"The way you talk to her is ridiculous. You know there is parts in here, specifically Page 32 it looks like, where you go back and quote exactly what the parenting time is and say that if I wanted to be a dick I could. And, you know, that's not what the parenting time is. But I do find that you knew on June 27 at the earliest that wasn't your parenting time."

¶ 20    On October 16, 2024, Kord filed a *pro se* notice of appeal, appealing both the September 19, 2024, hearing and judgment, and the October 4, 2024, judgment.

¶ 21                                                II. Analysis

¶ 22    Kord argues first that the trial court failed to abide by evidentiary rules "by showing prejudice" towards him and "consistently" interrupting him. He contends that the trial court's "constant interruptions/objections, degrading remarks, one-sided application of the law, and overall conduct" was a "blatant showing of prejudice and abuse of discretion." We disagree. A review of the report of proceedings for the September 19, 2024, hearing reveals a trial court, which was highly familiar with the parties, attempting to reach the core of Kord's allegations. Both parties were *pro se*, and to understand both sides' narratives, the trial court posed questions to both parties. Kord, though, responded, at times, argumentatively. For example, the following exchange occurred during Kord's case in chief when he was testifying:

"[KORD:] When she told me it was in her bookbag, I'm not going to touch it. I know they'll turn that around and try to claim that I gave it to her. I want it proved I had no access to that. It couldn't have come from me. So she gave it straight to the deputy and the assistant princip[al] was standing there. He asked my daughter where she got it.
THE COURT: I'm not going to hear this. You know to bring these witnesses.
[KORD:] You guys yell at me if I subpoena cops and tell me I'm going to be sanctioned because I'm wasting your time.
THE COURT: I've never yelled at you.
[KORD:] Other Judges have, so there has to be some consistency.
THE COURT: You have to subpoena witnesses, sir. You can laugh all you want.
[KORD:] I don't mean to be laughing.

7

> THE COURT: The principal is not a police officer. Why didn't you subpoena him?
>
> [KORD:] I have subpoenaed witnesses and Judge Brandmeyer told me he was surprised that they even showed up, that I'm wasting the Court's time and I'll be sanctioned if I do it again.
>
> [CASANDRA:] He said you were wasting the time not because they were police officers, because they were frivolous motions.
>
> THE COURT: Sir, I've never yelled at you and I'm not going to yell at you. Just, you've got to testify to things that aren't barred by the rules of evidence."

¶ 23 A review of the questions the trial court posed to Kord, such as these,[2] indicates that it was attempting to gather information that was not freely forthcoming from Kord. A trial judge may question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues. *Obernauf v. Haberstich*, 145 Ill. App. 3d 768, 771 (1986). The trial court is given wider latitude in examining witnesses in bench trial, where the risk of prejudice is less and the court's inquiries are compatible with its role as fact-finder. *Id.* This is precisely what occurred here. To streamline Kord's testimony to reach the core of his case, the trial court posed questions it felt necessary. Further, "[a] trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice. [Citation.] Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. [Citation.] A judge's display of displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel." *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010). We find no "degrading remarks" or "one-sided application of the law," nor do we determine that the trial court exhibited any "showing of prejudice." Instead, we find a trial court patiently and adequately performing its function as a trier of fact.

---

[2]Throughout this disposition, various excerpts of the September 19, 2024, hearing are provided and discussed based on the argument to which it pertains. However, all of those selections are additional examples of questions posed by the trial court to Kord to ascertain his specific assertions at that time.

¶ 24    Kord next argues that the trial court would not allow him to testify about statements made by R.L.C., telling him the testimony was hearsay. Hearsay is a "statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." *Taylor v. City of Chicago*, 2024 IL App (1st) 221232, ¶ 106. "We review evidentiary rulings on hearsay testimony and any exceptions to hearsay under an abuse of discretion standard. [Citation.] We find an abuse of discretion only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.* ¶ 105.

¶ 25    During the September 19, 2024, hearing, after Kord attempted to testify about what R.L.C. told him, the following exchange occurred:

> "[KORD:] That's what woke up our daughter. She woke up and looked into the curtain into her parents room and witnessed her mom and John smoking out of pipes and taking small white pills.
> THE COURT: How is that abuse?
> [KORD:] Children shouldn't be watching their children do drugs.
> THE COURT: I'm not going to consider that. That's hearsay. You're telling me what a six year old said to you.
> [KORD:] That's what my daughter reported to me and as the custodial parent, I can testify to what my children tell me.
> THE COURT: You tell me that hearsay rule. That's not a rule of hearsay, sir. I'm trying to give you leeway, but that is not the rule that a custodial parent gets to testify to anything a child says."

¶ 26    The following is another attempt of Kord trying to testify about what R.L.C. said when she took the drug paraphernalia back into the school to the police officer:

> "THE COURT: Sir, I've never yelled at you and I'm not going to yell at you. Just, you've got to testify to things that aren't barred by the rules of evidence.
> [KORD:] Can my daughter—she can't tell you about the conversation she had with the cop.
> THE COURT: She can tell me what she told the police officer.
> [KORD:] But if I was standing there and witnessed that conversation, I can't testify to that?
> THE COURT: It's an out of court statement you're offering for the truth of the matter asserted. How does she cross-examine a statement?

9

[KORD:] I'm trying to understand the difference between why my daughter could tell you that and I couldn't.

THE COURT: She can object to that too. I can't give you all of the rules of evidence."

¶ 27 There were several additional similar instances during the hearing wherein Kord tried to testify about what R.L.C. had told him. The trial court was consistent in refusing to allow such testimony. Kord references several statutes for his proposition that he was entitled to testify about what R.L.C. told him. He first cites section 2-18(c) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-18(c) (West 2022)). However, that statute "provides the procedures that must be followed for determining whether a minor should be removed from his or her parents' custody and made a ward of the court." *In re A.P.*, 2012 IL 113875, ¶ 18. The present matter was instituted under the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 *et seq.* (West 2022)) and not the Juvenile Court Act.

¶ 28 Second, he cites section 606.5(c) of the Marriage Act, arguing that this allows previous statements made by a child relating to any allegations of abuse or neglect to be admissible. However, Kord cites only the portion of the statute that benefits him and neglects to include the last sentence of the section, which states, "No such statement, however, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 750 ILCS 5/606.5(c) (West 2022). Kord testifying about what R.L.C. told him is uncorroborated, and the statement is not subject to cross-examination.

¶ 29 Third, he cites section 8-2601(a) of the Code of Civil Procedure (735 ILCS 5/8-2601(a) (West 2022)), which allows an out-of-court statement of a minor regarding abuse to be admitted. However, again, Kord fails to cite the entire section of the statute, which sets forth two criteria that must be met for such a statement to be admissible. First, the trial court must conduct a hearing to determine that "the time, content, and circumstances of the statement provide sufficient safeguards

10

of reliability," and the child must either testify or, if unavailable, corroborative evidence is available. *Id.* Kord did not follow this procedure and cannot claim now that the trial court has erred.

¶ 30    Kord's reliance on these three statutes to support his position that he was entitled to testify about what R.L.C. told him is misplaced as they do not allow him to present hearsay testimony in this matter. "The fundamental basis for excluding such a statement is the lack of an opportunity to test the credibility of the statement through cross-examination." *People v. Johnson*, 2013 IL App (1st) 111317, ¶ 45. Without an exception to the hearsay rule, Kord cannot testify for R.L.C. Kord's attempts at testifying to what R.L.C. told him and said is not an acceptable method of providing testimonial evidence. The trial court did not abuse its discretion in refusing to allow such testimony.

¶ 31    Kord next argues that the trial court erred in admitting Casandra's exhibit (Exhibit A) during the September 19, 2024, hearing, which consisted of a message in a parenting app from him to her, which read:

> "I'm not playing your game narcicisstic [*sic*]. I can't wait until your [*sic*] in prison or underground where you belong.You are a child abuser."

¶ 32    Kord objected to its admissibility at the hearing, arguing that the exhibit was not labeled, that it was only a small part of the conversation, and that it was not relevant. "The admission of evidence is reviewed under the abuse of discretion standard of review. [Citation.] An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court." *People v. Risper*, 2020 IL App (1st) 160707, ¶ 36.

¶ 33    Regarding the assertion that Casandra's exhibit was not labeled, the trial court indicated that it would label it for her, and as such, was not a viable reason for a trial court to deny the

11

exhibit. As to the argument that the exhibit was only a small portion of a string of messages between the two, the trial court pointed out that one of Kord's exhibits similarly consisted of messages that were only part of a whole conversation from the same parenting app. Kord cannot complain about Casandra's piecemeal messages while he undertook to present the same sort of evidence. The trial court was consistent in allowing both parties to admit portions of messages.

¶ 34    The crux of Kord's argument is that the message was irrelevant. "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Camco, Inc. v. Lowery*, 362 Ill. App. 3d 421, 433 (2005). Casandra was using the message to show that she did not abuse the children and that Kord had a tendency to continuously accuse her of doing so. While it may not have been a direct defense to Kord's allegations, it was relevant enough, considering this hearing was the third instance Kord was before the trial court regarding the March 10, 2024, incident. The message provided the trial court with an additional glimpse of Kord's repeated allegations of abuse on the part of Casandra. The trial court did not abuse its discretion in admitting Casandra's Exhibit A.

¶ 35    With that said, in rendering its decision, the trial court never referred to this exhibit. Even if we were to determine that the message was not relevant, "the admission of irrelevant evidence is harmless error if no reasonable probability exists that the verdict would have been different had the irrelevant evidence been excluded." *People v. Lynn*, 388 Ill. App. 3d 272, 282 (2009). The fact that the trial court did not rely on this message when discussing the reasoning for its decision to deny the emergency petition leads us to conclude that it played no role in its decision. The only instance the trial court mentions the message is after Kord argued with it after it had rendered its decision, stating:

12

"Sir, I've issued my order. I hope that—I don't know the context of it nor do I really care, but I hope this isn't your true feelings, [']I can't wait until you're in prison or underground where you belong.['] How—that's what I'm saying. You two need to be able to communicate with each other because it's never going to get better until the two of you do."

¶ 36  It mentioned the message to explain to the parties why they needed to start working together and improve their communication. However, Kord fails to acknowledge this and instead attempts to manipulate the reason for its use for his benefit. "Quite simply, the trial court did not rely on this evidence, and petitioner was therefore not prejudiced by its admission. Any alleged error was harmless, and we need not consider this issue further." *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 964 (2006).

¶ 37  Kord next argues that the trial court erred by refusing to interview R.L.C. *in camera*. " 'A court does not need to interview a child in order to consider and weigh what it considers to be the wishes of the child.' " *Grunstad v. Cooper*, 2012 IL App (3d) 120524, ¶ 22 (quoting *In re Marriage of Wanstreet*, 364 Ill. App. 3d 729, 733 (2006)). However, section 604.10(a) of the Marriage Act provides that "[t]he court may interview the child in chambers to ascertain the child's wishes as to the allocation of parental responsibilities." 750 ILCS 5/604.10(a) (West 2022). Whether to interview a child *in camera* is within the court's sound discretion. *In re Marriage of Knoche*, 322 Ill. App. 3d 297, 304 (2001); 750 ILCS 5/604.10(a) (West 2022). "An abuse of discretion only occurs where no reasonable person would agree with the position taken by the [circuit] court." *In re Marriage of Agers*, 2013 IL App (5th) 120375, ¶ 24. If a court determines there is a good reason not to interview a child *in camera*, then we will not substitute our judgment for that of the trial judge. *In re Marriage of Johnson*, 245 Ill. App. 3d 545, 554 (1993).

¶ 38  Here, the trial court did not abuse its discretion in denying the request for an *in camera* interview. First, it benefited from a video concerning the interaction Kord claimed evidenced

abuse. Watching the events unfold instead of speaking to R.L.C. was more demonstrative and helpful to the trial court and less traumatic to R.L.C. Second, the parties have been in front of the trial court many times, and it is very familiar with the animosity between them. The substance of this hearing concerned an incident that Kord had previously brought before the trial court twice, yielding an unsuccessful result each time. The trial court was acquainted with the allegations and gave Kord leeway in presenting evidence again and believed that R.L.C. would not be able to offer any additional unknown facts. Finally, it was well aware of the constant bickering between the parties and, no doubt, its adverse effects on the children. Making the children testify about minor incidents such as these, either in open court or privately with the judge, is traumatic, and the trial court did not want to add additional emotional distress to the children than what they undoubtedly get at home. Simply stated, the trial court did not feel the circumstances justified interviewing R.L.C. *in camera*, and we find no abuse of discretion in its decision.

¶ 39　　Kord next argues that he presented more than enough evidence to prove that R.L.C. was abused and that her physical, mental, and moral health was endangered. Kord cites section 603.10 of the Marriage Act (750 ILCS 5/603.10 (West 2022)) in support of his argument. This section allows a trial court to restrict parental responsibilities if it finds that a parent is endangering a child. An attempt to restrict parental responsibilities under this section is a two-step process. First, the trial court must find, by a preponderance of the evidence, that a parent has "engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development." 750 ILCS 5/603.10(a) (West 2022). Second, if the trial court finds an endangerment, "it must then enter orders necessary to protect the child." *In re Marriage of Mayes*, 2018 IL App (4th) 180149, ¶ 58. "When a trial court makes a finding by a preponderance of the evidence, this court will reverse that finding only if it is against the manifest

14

weight of the evidence. A court's factual determination will be found to be against the manifest weight of the evidence if, upon review of the entire record, the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *Id.* ¶ 59. Kord, as the party seeking to restrict parenting time, had the burden of proving Casandra's conduct seriously endangered the children.

¶ 40    Here, there was no showing of serious endangerment to the children. The only tangible evidence presented was the video of Glynn grabbing the purse off of R.L.C. In the video, Glynn asks R.L.C. to leave her purse behind, but she refuses and puts it over her head. He asks her again, and she refuses. He grabs the bag from around her neck and tries to remove it while she backs off. He eventually gets it off of her, and she cries out repeatedly, stating that her father will get mad at her for not having her purse. Casandra consoles her, and she continues to plead that her father will get mad at her. She does not say that she is hurt, in pain, or that Glynn hurt her. Simply put, the video does not support Kord's claim that R.L.C. was abused. To the contrary, it shows a child who is concerned about her father getting angry with her for not having her phone with her at all times.

¶ 41    Further, the testimony of R.L.C. did nothing to bolster Kord's allegations. When questioned by Kord during the hearing, her answers were unspecific and vague. For instance, the following testimony occurred:

> "[KORD:] Can you explain why you don't feel safe at your mom's?
> [R.L.C.:] Well, it's kind of hard to explain, but I'll try to do my best so that it makes sense to you guys. If I can think of a way. I can't really think of a way to make sense to you guys.
>                    * * *
> [KORD:] Can you tell me what happens that makes you not feel safe?
> [R.L.C.:] Kind of hard to explain that too. That's the same question just maybe a little bit harder for me to explain to you guys.
>                    * * *
> [KORD:] Has there ever been anything else happen at your mom's where you were hurt?
> [R.L.C.:] That may be a little tough question because some of my memories, I can't remember. Some I can.
>                    * * *

15

[KORD:] Do you like going out and spending time with your mom?

[R.L.C.:] I love her. I like going out there, but I don't like staying out there like overnight. I don't mind the daytime and in the evening but over dark time, no.

[KORD:] Why is that?

[R.L.C.:] Well, that is kind of hard to explain. I can't really think of a way to explain that either. It's almost the same question that you asked me a little bit ago at the beginning. I'll see for a second if I can think of a way to explain it but if I can't, I'm sorry."

¶ 42 R.L.C. was unable to provide any detail in her answers. She was general, evasive, and provided no reliable testimony regarding the alleged abuse by Casandra. Other than R.L.C.'s vague testimony and the unalarming video, Kord failed to present any evidence, such as pictures, testimony of a police officer or physician, or any other tangible proof to substantiate the allegations he made. R.L.C.'s testimony, coupled with the video from the kitchen, does not support endangerment by Casandra. Kord failed to meet the burden required by the statute, and the trial court's finding was not against the manifest weight of the evidence.

¶ 43 Kord's final argument is that the trial court erred in finding him in indirect civil contempt. Civil contempt generally consists of a party failing to do an action ordered by a court with a resulting loss to the opposing party. *In re Marriage of Tatham*, 293 Ill. App. 3d 471, 479 (1997). "Contempt which occurs outside the presence of the court is classified as indirect contempt." *Id*. at 480.

¶ 44 For a finding of indirect civil contempt, Casandra first had to prove by a preponderance of the evidence that Kord violated a trial court's order. *In re Marriage of LaTour*, 241 Ill. App. 3d 500, 508 (1993). If Casandra met that burden, Kord then had to show that noncompliance with the trial court's order was not willful or contumacious and that he had a valid excuse for failure to follow the trial court's order. *In re Marriage of Tatham*, 293 Ill. App. 3d at 480. "Contumacious conduct consists of 'conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court.' " *In re Marriage of*

16

*Charous*, 368 Ill. App. 3d 99, 108 (2006) (quoting *In re Marriage of Fuesting*, 228 Ill. App. 3d 339, 349 (1992)). Whether a party is guilty of indirect civil contempt is a question for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence, or the record reflects an abuse of discretion. *In re Marriage of Logston*, 103 Ill. 2d 266, 286-87 (1984). "A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotation marks omitted.) *In re Marriage of Demaret*, 2012 IL App (1st) 111916, ¶ 43.

¶ 45    Kord first asserts that the contempt petition "did not specifically claim that the Petitioner had willfully violated the parenting plan, acted with any malicious intent." This argument is baseless as the petition states explicitly in paragraph 2, "[i]n violation of the aforesaid order, Kord Cain has willfully and contumaciously failed to comply with the requirements thereof." Additionally, it alleges that Kord has failed to comply with visitation by not following the parenting plan. The petition sufficiently pled the required elements for contempt.

¶ 46    As to the finding of contempt, we cannot conclude that the trial court's judgment was against the manifest weight of the evidence. There is no dispute that a parenting plan order was in effect that granted Casandra parenting time with the children over the Fourth of July holiday. Kord even admitted knowing it was Casandra's time with the children. There is also no dispute that Kord did not provide Casandra with her parenting time. The only issue is whether Kord proved his noncompliance was not willful and contumacious. Kord's argument for not allowing Casandra to have her parenting time was that it was "an honest mistake." However, Casandra had texted him the week before the holiday and told him she would not allow him to take the children to Arkansas. Therefore, he knew it was not his parenting time a week before violating the order. Kord testified

17

that despite knowing this, his mindset was that he could either upset the children or Casandra and chose to upset Casandra. He purposefully and knowingly violated the court order, knowing it was not his parenting time. This is clearly willful and contumacious, and the finding of indirect civil contempt was not against the manifest weight of the evidence.

¶ 47                                      III. Conclusion

¶ 48     For the foregoing reasons, we affirm the trial court's judgment.


¶ 49     Affirmed.